# LORAIN COUNTY COURT OF COMMON PLEAS
## LORAIN COUNTY JUSTICE CENTER
### 225 COURT STREET
### ELYRIA, OHIO  44035

MD AUTO GROUP LLC
5013 DETROIT RD
SHEFFIELD VILLAGE, OH  44054

CASE NO. 21CV203874

VS.

TO:   NISSAN NORTH AMERICA INC
      CORP. SERVICE CO S/A
      50 W BROAD ST #1330
      COLUMBUS, OH  43215

# S U M M O N S   O N   C O M P L A I N T

You have been named defendant in a complaint filed in Lorain County Court of Common Pleas by plaintiff(s):

MD AUTO GROUP LLC
5013 DETROIT RD
SHEFFIELD VILLAGE, OH  44054

A copy of the complaint is attached hereto. The name and address of the plaintiff's attorney is:

CHRISTOPHER M DEVITO
MORGANSTERN, MACADAMS & DEVITO CO., LPA
623 WEST SAINT CLAIR AVENUE
CLEVELAND, OH  441131204

You are hereby summoned and required to serve a copy of your answer to the complaint upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, within **TWENTY-EIGHT (28) DAYS** after service of this summons on you, exclusive of the day you receive it.   Your answer must **ALSO** be filed with this Court within three (3) days after you serve, (delivered or by mail), a copy of your answer on the plaintiff's attorney.

If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded in the complaint.

*TOM ORLANDO*
**CLERK OF COURTS OF COMMON PLEAS**
**LORAIN COUNTY, OHIO**

**7/14/2021**

BY: _____

**Deputy Clerk**

\*21CV203874\*

EXHIBIT

A

FILED
LORAIN COUNTY

2021 JUL -9  A 10: 14

COURT OF COMMON PLEAS
TOM ORLANDO

IN THE COURT OF COMMON PLEAS
LORAIN COUNTY, OHIO

21CV203874

| | |
|---|---|
| MD Auto Group, LLC dba I-90 Nissan, <br> an Ohio Limited Liability Company <br> 5013 Detroit Road <br> Sheffield Village, Ohio 44054 | ) <br> ) CASE NO. <br> ) <br> )     JUDGE CHRISTOPHER ROTHGERY <br> ) JUDGE |
|          Plaintiff | ) <br> ) <br> ) |
| v. | )    **COMPLAINT (With Jury Demand)** <br> ) |
| Nissan North America, Inc., <br> a Foreign California Company <br> c/o Its Statutory Agent <br> Corporation Service Company <br> 50 West Broad Street, Suite 1330 <br> Columbus, Ohio 43215 | )   **(Violations of R.C. Chapter 4517;** <br> )   **Declaratory Judgment;** <br> )   **Breach of Fiduciary Duty; and** <br> )   **Breach of Implied Good Faith)** <br> ) <br> ) <br> ) |
|          Defendant | ) <br> ) |

      Plaintiff MD Auto Group, LLC dba I-90 Nissan ("I-90" or "Plaintiff"), by and through its undersigned counsel, submits the following Complaint against Defendant Nissan North America, Inc. ("NNA" or "Defendant") as follows:

**PARTIES, JURISDICTION, AND VENUE**

      1.     Plaintiff MD Auto Group, LLC dba I-90 Nissan ("I-90") is a company duly organized and existing under the laws of the State of Ohio and is a franchisee-dealer of vehicles as defined by R.C. 4517.01(K) and (V) of the Ohio Dealer Act, R.C. Chapter 4517 ("ODA").

      2.     Defendant Nissan North America, Inc. ("NNA") is a foreign California corporation headquartered at 1 Nissan Way, Franklin, Tennessee 37067 and is a franchisor-manufacturer of vehicles as defined by R.C. 4517.01(Q) and (W) of the ODA.

      3.     I-90 is new motor vehicle dealer licensed in accordance with the laws of the State of Ohio to sell and service new and used NNA motor vehicles, products, and services at its place of business located at 5013 Detroit Road, Sheffield Village, Ohio 44054 in Lorain County.

4.      NNA is a new motor vehicle manufacturer engaged in the new motor vehicle industry in Ohio, which that is comprehensively regulated by the ODA and its requirements, prohibitions, rights, and remedies that supersede all conflicting contract terms imposed by manufacturers on dealers in the State of Ohio.

5.      The Ohio courts of common pleas have jurisdiction over the parties regarding the state law statutory ODA claims and Ohio common law causes of action pled herein.

6.      Venue is proper in Lorain County before this Honorable Court, pursuant to various sections of the Ohio Rules of Civil Procedure ("Civil Rules" or "Civ.R.") 3, because it is a county in which the Defendant NNA conducted activity that gave rise to the claim for relief and a county in which all or part of the claim for relief arose.

## STATEMENT OF FACTS

7.      NNA is an original equipment manufacturer (OEM") of new motor vehicles for multiple brands of passenger and commercial vehicles in North America, this includes but is not limited to, the Nissan and Infiniti passenger line of cars and trucks and the NV Line of commercial trucks and vans.

### *Commercial vehicles are different than passenger vehicles*

8.      The United States broadly defines a "commercial motor vehicle" as any self-propelled or towed vehicle used on a public highway in interstate commerce to transport passengers or property when the vehicle has any of the following characteristics:  (A) has a gross vehicle weight rating of 4,536 kg (10,001 pounds) or more; (B) is designed or used to transport more than 8 passengers (including the driver) for compensation; (C) is designed or used to transport more than 15 passengers, including the driver, not used to transport passengers for compensation; (D) is used in transporting material found by the Secretary of Transportation to be hazardous.[1]

9.      Ohio has an even broader definition of a "commercial car" or "truck" as "any motor vehicle that has motor power and is designed and used for carrying merchandise or freight, or that is used as a commercial tractor." R.C. 4501.01(J).

10.     The Ohio Revised Code further defines "noncommercial motor vehicle" as "any motor vehicle … that is designed by the manufacturer to carry a load of no more than one ton

---

1  See, US Federal Motor Carrier Safety Regulations §390.5 accessed on June 30, 2021, at https://www.ecfr.gov/cgi-bin/retrieveECFR?
gp=1&ty=HTML&h=L&mc=true&=PART&n=pt49.5.390#se49.5.390_15.

and is used exclusively for purposes other than engaging in business for profit." R.C. 4545.01(H).

11.     The Ohio Revised Code defines "passenger car" as "any motor vehicle that is designed and used for carrying not more than nine persons and includes any motor vehicle that is designed and used for carrying not more than fifteen persons in a ridesharing arrangement." R.C. 4501.01(E).

12.     Based on the above Ohio and federal definitions for a commercial vehicle, NNA's NV Line of commercial trucks and vans are commercial vehicles under R.C. Chapter 4517 and the ODA.

### *NNA manufactures commercial vehicles for sale through approved franchisees*

13.     NNA must approve a dealer to sell and service the NV Line of commercial vehicles and not every dealer that is approved by NNA as a dealer for Nissan or Infiniti passenger vehicles has the right to sell the NV Line of commercial vehicles.

14.     I-90 is an authorized new motor vehicle dealer for the sale and service of NNA's Nissan passenger brand vehicles for cars, trucks, products, and services pursuant to a written agreement with NNA that includes a product addendum for NNA's Nissan brand of passenger vehicles.

15.     I-90 is also an authorized new motor vehicle dealer for the sale and service of NNA's NV Line commercial brand vehicles for trucks, vans, products, and services pursuant to an additional written agreement with NNA that includes a supplemental product addendum for NNA's NV Line brand of commercial vehicles.

16.     The NNA Dealer Sales and Service Agreement ("DSSA") with I-90, for both the Nissan passenger car and truck brand and the NV Line commercial truck and van brand, like all contracts in Ohio, have an implied covenant of good faith and fair dealing imposed upon all terms and conditions between the parties.

17.     NNA's DSSA with I-90 also states that it is to be governed the laws of California, which also recognizes and imposes on all contract terms and conditions an implied covenant of good faith and fair dealing between the parties.

18.     At all relevant times, I-90 has properly complied with any and all of the reasonable and material terms in the NNA DSSA, including the sales and service for NNA's NV Line for commercial truck and van brand of new motor vehicles, products, and services.

### *The Ohio Dealer Act ("ODS") is remedial legislation to protect dealers*

19.     In 1979, the Ohio Legislature enacted the Ohio Dealer Act, R.C. Chapter 4517 ("ODA") to comprehensively regulate the new motor vehicle industry relationship between manufacturers (i.e. NNA) and dealers (i.e. I-90) in the State of Ohio because of the disparate bargaining positions, wrongful conduct by manufacturers, and for the public's well-being and benefit because the new motor vehicle industry has a large economic impact upon the residents and citizens in the State of Ohio.

20.     The ODA's protections, prohibitions, rights, and remedies are non-waivable and supersede all contrary contract terms attempted to be imposed by the manufacturer upon a dealer. R.C. 4517.59(C).

21.     The Legislature recently amended the ODA and added R.C. 4517.011 explaining that the remedial statute must "be liberally construed" in order to enforce "the comprehensive and uniform framework for ... regulating manufacturers … of motor vehicles."

### *I-90 is both a passenger and commercial vehicle dealer approved by NNA*

22.     I-90 purchased an existing Nissan dealership in 2014 and NNA approved I-90 as a dealer through a Term DSSA dated April 1, 2014, to sell and service (A) the Nissan brand of passenger cars & trucks, products, and services and (B) the NV Line brand of commercial trucks, vans, products, and services.

23.     NNA subsequently re-approved I-90 as a dealer through a DSSA dated May 30, 2017, to sell and service (A) the Nissan brand of passenger cars and trucks, products, and services and (B) the NV Line brand of commercial trucks and vans, products, and services.

### *NNA provides separate rights and sales incentives to its commercial dealers*

24.     NNA's DSSA identifies and distinguishes between its dealers that are approved for Nissan passenger vehicles (i.e. "Dealers") and Nissan commercial vehicles (i.e. "Nissan Commercial Vehicle Dealers") through Product Addendums.

25.     A Nissan Commercial Vehicle Dealer (i.e. I-90) has the contractual right to order, purchase, sell, and service NNA commercial vehicles of trucks and vans and commercial products of parts and accessories that a Nissan Dealer for passenger cars and trucks does not have contractual right because it is not a commercial dealer approved by NNA through a Product Addendum.

4

26.     Only a commercial NV Line dealer (i.e. I-90) can order NNA's NVP's or NV Cargo vehicles (Full Size) that includes the following models:  NV1500, NV2500, NV3500, NV1500HR, NV2500HR, NV3500HR, and NVP Passenger Van.

27.     Only a commercial NV Line dealer (i.e. I-90) receives additional stair-step incentives for sales of NV Line vehicles that regular passenger Nissan Dealers do not qualify for from NNA.

28.     NNA also provides an up-fitting incentive only to Nissan Commercial Vehicle Dealers (i.e. I-90) for the NV Line vehicles (NVP, NV Cargo, and NV200) for bulk heads, interior cabinets, ladder racks, etc. and Nissan Commercial Vehicle Dealers receive a no-charge option to the customer or additional customer cash for these items that regular passenger Nissan Dealers do not qualify for from NNA.

29.     A Nissan Commercial Vehicle Dealer (i.e. I-90) also has separate and distinct sales incentives on NNA commercial vehicles of trucks and vans that a Nissan Dealer for passenger cars and trucks does not have access to because it is not a commercial dealer.

30.     A Nissan Commercial Vehicle Dealer (i.e. I-90) also has separate and distinct ordering and allocation for NNA commercial vehicles of trucks and vans that a Nissan Dealer for passenger cars and trucks does not because it is not a commercial dealer.

31.     A Nissan Commercial Vehicle Dealer (i.e. I-90) also has separate and distinct sales and service NNA representatives dedicated for commercial vehicles of trucks and vans that a Nissan Dealer for passenger cars and trucks does not report to because it is not a commercial dealer.

32.     A Nissan Commercial Vehicle Dealer (i.e. I-90) also has separate and distinct facility requirements for the size of the vehicle lifts to perform service on the larger and heavier vehicles, special tools, and parts for NNA's commercial NV Line vehicles of trucks and vans that a Nissan Dealer for passenger cars and trucks is not required to have because it is not a that sells and service a commercial line of NV vehicles.

33.     A Nissan Commercial Vehicle Dealer (i.e. I-90) also has separate and distinct sales performance standards, *if any*, for NNA NV Line commercial vehicles of trucks and vans as compared to a Nissan Dealer for passenger cars and trucks.

### NNA uses a Supplemental Product Addendum to approve commercial dealers

34.     NNA's Supplemental Product Addendum for the NV Line to I-90, as an approved Nissan Commercial Vehicle Dealer, clearly states that NNA grants to I-90 the "right to buy for

resale the Nissan Products identified below:  **(1) Nissan Commercial Vehicles NV.  Note: This vehicle's distribution is only to Certified Nissan Commercial Vehicle Dealers and it should not be dealer traded to non-certified dealers.**" (Emphasis added).

35.     NNA's Supplemental Product Addendum to I-90, as an approved Nissan Commercial Vehicle Dealer, further states that NNA grants to I-90 the "right to buy for resale the Nissan Products identified below:  … (2) Genuine Nissan parts and accessories **for the Nissan NV**. (3) All other products marketed by Nissan through certified dealers **for the Nissan NV**." (Emphasis added).

36.     NNA's Supplemental Product Addendum to I-90, as an approved Nissan Commercial Vehicle Dealer, expressly describes that the Nissan Commercial Vehicles NV as a separate and distinct "line-make, series, brand, or class of new vehicle" from NNA's Nissan passenger cars and trucks brand and NNA's Infiniti passenger cars and truck brand.

### NNA gives improper notice that it is discontinuing its commercial NV Line vehicles

37.     On October 9, 2020, NNA gave written notice to I-90 that it in "mid-2021, North American production of the NV Cargo, NV Passenger and NV200 vans will end," which results in the "discontinuance of a line-make, series, brand, or class of new vehicle" currently identified as NNA's NV Line of commercial vehicles.

38.     On November 20, 2020, NNA gave email notice to all Nissan Commercial Vehicle Dealers of its "Nissan NV Final Dealer Allocation Formula" that offered a " 'one time allocation' December 1st through December 4th" for a "final 'Sell-Down' allocation [that] will combine January through June production" of the NV commercial NV Line vehicles.

39.     I-90's last ability to order any NV Cargo van commercial vehicles from NNA, pursuant to the November 20, 2020, email notice, was December 1-4, 2020, and I-90 still has not received, *and may never receive*, the last NV Cargo commercial vehicles ordered from NNA over six months ago.

40.     Further, NNA is not replacing these commercial vehicles of trucks and vans with other commercial vehicle models, but instead exiting the commercial vehicle market and began in October 2020 a new program identified as "Nissan Business Advantage for commercial vehicle customers" that allows ALL current Nissan Dealers (i.e. passenger Nissan dealers) to sell Nissan passenger cars and trucks to commercial customers, or any retail customer.

41.     However, passenger vehicles are not the same as commercial vehicles and NNA's new Business Advantage program, available to all Nissan Dealers, not just the Nissan

Commercial Vehicle Dealers previously approved by NNA though a written Supplemental Product Addendum, is a termination and discontinuance of the NV Line commercial brand for I-90 and all NNA approved Nissan Commercial Vehicle Dealers in Ohio.

42.      I-90 is timely commencing the within Complaint for monetary and equitable relief pursuant to the ODA's statutory protections and Ohio's common law.

## COUNT ONE (Ohio Dealer Act)

43.      I-90 incorporates all of the above paragraphs as if fully rewritten herein.

*A.      NNA Violating ODA Prohibitions – R.C. 4517.541 Termination of franchise; notice.*

44.      R.C. 4517.541(A) expressly states as follows:   "Each franchisor proposing to terminate, cancel, discontinue, or not renew a franchise based upon any of the following shall send written notice by certified mail of the proposed action to the franchisee at such time as may be necessary to ensure that **the notice is received not later than twelve months before the effective date of the proposed action** ...".  (Emphasis added).

45.      R.C.  4517.541(A)(3) includes in the definition of franchise termination the "[d]iscontinuance of the sale of a line-make, series, brand or class of vehicles or a change in distribution system by the manufacturer, whether through a change in distributors **or the manufacturer's decision to cease conducting business through a distributor altogether.**" (Emphasis added).

46.      The ODA further explains at R.C. 45127.542(H) that "[n]othing in this section or section 4517.541 of the Revised Code shall be construed as prohibiting a manufacturer or distributor from changing, adding or deleting models, specifications, model names, numbers or identifying marks, or similar characteristics of the new vehicles it markets, **provided that the change, addition, or deletion does not result in the termination or <u>discontinuance of a line-make, series, brand, or class of new vehicle.</u>**"  (Emphasis added).

47.      Because the ODA is remedial legislation, it must be liberally construed to promote the rights, protections, and remedies of dealerships against manufacturer abuses and unfair practices. *Earl Evans Chevrolet v. General Motors Corp.*, 598 N.E.2d 1187 (Ohio App. 11th Dist.1991); R.C. 4517.011.

48.      NNA's discontinuance of the NV Line commercial vehicles is within the ODA's R.C. 45127.542(H) express definition of "the termination or discontinuance of a line-make, series, brand, or class of new vehicle."

49.     Further, NNA's discontinuance of the NV Line commercial vehicles is within the ODA's R.C. 45127.542(H)'s definition of "the termination or discontinuance of a line-make, series, brand, or class of new vehicle" when applying a liberal construction and broad interpretation of the ODA's statutory language to protect existing dealers.

### NNA failed to provide the required twelve-months' prior notice to I-90

50.     NNA failed to provide the required twelve-months' notice to I-90 as required by R.C. 4517.542 by its letter dated October 9, 2020, stating that in "mid-2021, North American production of the NV Cargo, NV Passenger and NV200 vans will end …".

51.     NNA's October 2020 notice of its discontinuing production by mid-2021 is only eight (8) months' prior notice.

52.     Further, the actual discontinuance and ability of I-90 and all Nissan Commercial Vehicle Dealers to order NV Line commercial vehicles was December 1-4, 2020.

53.     The actual and real-world discontinuance of NNA's NV Line of commercial vehicles was December 2020, or only two (2) months after NNA's October 9, 2020, letter giving notice of its discontinuance and termination of the NV Line of commercial vehicles.

54.     NNA's current commercial vehicle website, www.NissanUSA.com/business-fleet, showcasing the entire portfolio of Nissan vehicles "at work" does <u>not</u> include the NV Cargo, NV Passenger, and NV200 vans as commercial vehicles for commercial customers, and has not advertised these NV Line commercial vehicles since October 2020.

55.     Currently and as of October 9, 2020, all Nissan Dealers for passenger cars and trucks can sell their passenger Nissan brand vehicles as "work" vehicles under NNA's newly created Nissan Business Advantage for commercial vehicle customers with no separate written agreement (i.e. Supplemental Product Addendum), but there does not exist any NNA NV Line commercial vehicles (i.e. NV Cargo, NV Passenger, and NV200 vans) that can be sold.

56.     NNA has violated the prohibition of R.C. 4517.542 by failing to provide the full twelve-months' notice before discontinuing the NV Line brand of commercial vehicles by only giving a two-month notice before I-90 could not order any more NV Line commercial vehicles.

### NNA refuses to pay I-90 for its discontinuance of the NV Live of commercial vehicles

57.     Further, R.C. 4571.542(A)(6)(a) requires that NNA pay I-90 the "fair market value of the franchise that is at least equivalent to the fair market value of the franchise on the day before the manufacturer announces the action that results in termination, cancellation, discontinuance, or nonrenewal."

8

58. NNA has failed to make an offer or provide any payment to I-90 that equals the "the fair market value of the franchise that is at least equivalent to the fair market value of the franchise on the day before the manufacturer announces the action that results in the termination, cancellation, discontinuance, or nonrenewal" as required by the ODA.

59. In December of 2020 I-90 met with NNA's regional vice president Craig Keeys to discuss NNA's recent October 9, 2020, notice of its discontinuance of the NV Line of commercial vehicles.

60. Mr. Keeys requested that I-90 set forth in writing its valuation of I-90's NV Line for commercial vehicles that it believed it was owed under the ODA for the fair market value.

61. On February 11, 2021, Pursuant to Mr. Keeys' request, I-90 wrote to NNA's regional vice president Craig Keeys setting forth (A) the applicable sections of the ODA regarding the required twelve-month notice that had been violated by NNA and (B) the required compensation sections in the ODA that required NNA to pay I-90 a sum of at least $2,000,000.00 under the various categories set forth by the Legislature.

62. On February 25, 2021, NNA through Mr. Keeys responded and denied that NNA was discontinuing the NV Line of commercial vehicles.

63. Mr. Keeys' response letter also refused to pay I-90 any sums due under the ODA, but instead offered that in "exchange for that financial support, NNA has asked that you execute a Transition Agreement, but you are under no obligation to accept NNA's money or execute the agreement."

64. NNA's proffered Transition Agreement fails to comply with the ODA's express provisions that enumerates the multiple categories of compensation that are required to be paid by a manufacturer to a dealer when it discontinues a line of vehicles.

65. In addition to the fair market value required to be paid by R.C. 4517.542(A)(6)(a), the ODA at R.C. 4517.542(A)(2-4) also requires that NNA to repurchase all special tools, signage, and parts as follows:

"(2) The franchisee's net acquisition cost of each new, unused, undamaged, and unsold part or accessory purchased from the manufacturer or a source recommended or approved by the franchisor if the part or accessory is in the current parts catalog. In the case of sheet metal, a comparable substitute for the original package may be used. If the part or accessory was purchased by the franchisee from an outgoing authorized franchisee, the franchisor shall purchase the part or accessory at the depreciated value price or the price in the current parts catalog, whichever is less.

(3) The franchisee's net acquisition cost of each undamaged sign if the sign bears a common name, trade name, or trademark of the manufacturer, the manufacturer required the new motor vehicle dealer to acquire the sign, and the sign was acquired by the new motor vehicle dealer from the manufacturer or a source approved by the manufacturer. A manufacturer shall purchase from the new motor vehicle dealer at fair market price poles or other hardware used to erect a sign if the manufacturer required the sign to be free standing and not include a trademark or trade name other than that of the manufacturer. For purposes of division (A)(3) of this section, fair market price is equal to the new motor vehicle dealer's original cost, reduced by one-tenth of the original cost for each year of ownership.

(4) The franchisee's net acquisition cost of all equipment, special tools, automotive service equipment, and other items bearing the manufacturer's trademark that were required by the manufacturer or distributor, and purchased from the manufacturer or a source recommended or approved by the manufacturer. The net acquisition cost shall be reduced over a period of five years at a rate of twenty per cent per year of ownership."

66.     NNA has failed to make an offer or provide any payment to I-90 to repurchase all special tools, signage, and parts related to the NV Line of commercial vehicles.

67.     The ODA at R.C. 4517.542(C)(3) also requires that NNA to provide dealership facility assistance, since I-90 owns the dealership facility, as follows:  "the manufacturer shall pay the new motor vehicle dealer a sum equivalent to the reasonable rental value of the dealership facilities for twelve months."

68.     NNA has failed to make an offer or provide any payment to I-90 that equals twelve months of rental value.

69.     Finally, the ODA at R.C. 4517.542(1)(a) requires that NNA pay, in the event there is any unsold inventory at I-90 of NV Line vehicles, the "franchisee's net acquisition cost for any new, undamaged, unaltered, and unsold vehicle in the franchisee's inventory of the current model year or the model year preceding the current model year, purchased from the franchisor or another franchisee of the same line-make in the ordinary course of business prior to receipt of a notice of termination, cancellation, discontinuance, or nonrenewal, provided the vehicle has less than five hundred miles registered on the odometer, including mileage incurred in delivery from the franchisor or in transporting the vehicle between new motor vehicle dealers for sale."

70.     NNA has not offered to repurchase any unsold NV Line inventory from I-90 and I-90 has not yet requested NNA to repurchase any NV Line inventory from the dealership because it is still selling the remaining NV Line of vehicles in its normal course of business.

71.     NNA is statutorily liable to I-90 for its compensatory damages, pursuant to R.C. 4517.542 categories that exceed $2,000,000.00 for the fair market value, plus the other ODA

categories of damages for (A) special tools, signage, and parts, (B) facility assistance, and (C) repurchase of unsold NV Line commercial vehicles.

72.     Further, the ODA at R.C. 4517.65(A) requires double actual compensatory damages when "a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees."

73.     NNA has violated and failed to perform the duties imposed by R.C. 4517.541 and R.C. 4517.542, which requires the Court to double all actual compensatory damages returned by a jury.

74.     As a direct and proximate result of NNA's actions, it is liable to I-90 for compensatory damages, which should be determined by a jury and then doubled by the court.

### B.     NNA Failing to Act in Good Faith – R.C. 4517.59(A)(1) Prohibited acts

75.     The Ohio Dealer Act, R.C. Chapter 4517's ("ODA") protections, prohibitions, rights, and remedies are non-waivable and supersede all contrary contract provisions attempted to be enforced by a manufacturer. R.C. 4517.59(C), *Nissan Motor Corporation, USA v. Dever*, 10th Dist. Franklin No. 99AP-596, 2000 WL 311915, fn. 2 (March 28, 2000), and *Mercure v. General Motors Corp.*, U.S.D.C. N.D. of Ohio Case No. 4:02CV2124 (March 17, 2003), p.*22.

76.     R.C. 4517.59(A)(1) requires a manufacturer to act in "good faith" and prohibits a manufacturer from acting unreasonably or attempting to hide behind a dealer sales and service contract as follows: "… no franchisor shall (1) In acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith." (Emphasis added).

77.     NNA is not acting in "good faith" by acting and purporting to create the Nissan Business Advantage for commercial vehicle customers that discontinues the commercial production of the NV Cargo, NV Passenger, and NV200 vans for I-90 and all of NNA's Nissan Commercial Vehicle Dealers.

78.     Under the ODA, which supersedes NNA's DSSA contract, the manufacturer may only discontinue "the sale of a line-make, series, brand or class of vehicles" (i.e. NV Line of commercial vehicles) by sending written notice that "is received not later than twelve months before the effective date of the proposed action …". (R.C. 4517.541(A) and R.C. 4517.541(A)(3)).

79. Under the ODA, which supersedes NNA's contract, NNA's October 9, 2020, written notice was not sent twelve months prior to its action of discontinuing production and the sale of its NV Cargo, NV Passenger, and NV200 vans to I-90 and all of NNA's Nissan Commercial Vehicle Dealers.

80. NNA actually discontinued the NV Line by December 1-4, 2020, when it gave I-90 and all Nissan Commercial Vehicles Dealers a "last" chance to order and have allocated NV Line commercial vehicles, which is less than two months after the October 9, 2020, notice.

81. NNA has failed to act in good faith by its actions of (A) failing to give the required twelve-months' prior notice before discontinuing the NV Line of commercial vehicles and (B) failing to pay, *or even offering to pay*, I-90 as required by the NNA for the fair market value of the NV Line franchise; NV Line parts, tools, and signage; NV Line facility assistance; and repurchase of any unsold NV Line commercial vehicles.

82. NNA is statutorily liable to I-90 for its compensatory damages, pursuant to R,C. 4517.542 categories that should be determined by a jury, but exceed $2,000,000.00.

83. Further, the ODA at R.C. 4517.65(A) requires double actual compensatory damages when "a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees."

84. NNA has violated and failed to perform the duties imposed by R.C. 4517.(A)(1) to act in good faith when "purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith," which requires the Court to double all actual compensatory damages returned by a jury.

85. As a direct and proximate result of NNA's actions, it is liable to I-90 for compensatory damages, which should be determined by a jury and then doubled by the court.

### COUNT TWO (Declaratory Judgment)

86. I-90 incorporates all of the above paragraphs as if fully rewritten herein.

87. An actual dispute exists between I-90 and NNA as to their rights and responsibilities under the ODA involving the NNA's discontinuation of the NV Line commercial brand of vehicles with I-90 and its lack of good faith in purporting to act under terms of the DSSA by canceling its production and sale of NV Cargo, NV Passenger, and NV200 commercial vans to I-90 and all of NNA's Nissan Commercial Vehicle Dealers.

88.     Plaintiff requests that this Court declare I-90's rights in the following manner:

A.  Declare that NNA violated R.C. 4517.541 and R.C. 4517.542 by failing to give the required twelve-months' written notice prior to discontinuing and terminating its commercial vehicle line of vehicles and the Nissan Commercial Vehicle Dealer agreement with I-90;

B.  Declare that NNA violated R.C. 4517.541 and R.C. 4517.542 by failing to pay I-90 for the fair market value of its Nissan Commercial Vehicle Dealer agreement with NNA as valued on October 8, 2020, the day before notice was sent that NNA was discontinuing and terminating its commercial vehicle line of vehicles and the Nissan Commercial Vehicle Dealer agreement with I-90;

C.  Declare that NNA violated R.C. 4517.541 and R.C. 4517.542 by failing to pay I-90 for the special tools, signage, parts, new commercial vehicle inventory, and twelve months of rent as facility assistance because of NNA's discontinuance and termination its commercial vehicle line of vehicles and the Nissan Commercial Vehicle Dealer agreement with I-90; and

D.  Declare that NNA's discontinuance and termination of its commercial vehicle line of vehicles and the Nissan Commercial Vehicle Dealer agreement with I-90 violates the Ohio Dealer Act at R.C. 4517.59(A)(1) by failing to act in good faith when purporting to act under the franchise agreement and/or discontinuing, terminating, canceling, or failing to renew a franchise.

**COUNT THREE (Breach of Contract and Implied Covenants)**

89.     I-90 incorporates all of the above paragraphs as if fully rewritten herein.

90.     The DSSA agreement between NNA and I-90 establishes California law as a choice of law with regard to general interpretation as to nonspecific provisions afforded automobile dealerships under Ohio law.  (DSSA, Standard Provisions at Section 17.F.) (Pursuant to Civ.R. 10(D)(1), the DSSA and its attachments are not being attached because they are voluminous and already in the possession of NNA).

91.     The California common law imposes on every contract a covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefit of the contract.  *Powerhouse Motor Sports Group, Inc. v. Yamaha Motor Corporation* (Court of Appeal, Second Dist., Division 6, November 26, 2013), 221 Cal. App.4th 867, 164 Cal. Rptr. 3D 811.

92.     California's covenant of good faith and fair dealing does not impose duties beyond the express terms of the contract, but, when a contract gives one party power affecting the rights of the other (i.e. approving dealership location), that party must exercise its discretion and good faith and in accordance with fair dealing. (*Id.*).

93.     NNA's DSSA with I-90, like all new motor vehicle manufacturers' franchise agreements with dealers, is a one-sided contract of adhesion because "the bargaining power of the manufacturer vis-a-vis the dealer is so great that the terms of any franchise agreement can be dictated virtually in their entirety by the manufacturer." *Barney Motor Sales v. Cal Sales, Inc.* (S.D. Calif. 1959), 178 F. Supp. 172, 174.

94.     The United States Supreme Court has cogently explained that "[d]ealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facility to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory." *New Motor Vehicle Board v. Orrin W. Fox Co.* (1978), 439 U.S. 96, 99 S. Ct. 403, 58 L.Ed.2d 361, reiterating the Congressional findings set forth in S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956).

95.     The DSSA specifically reserves to the manufacturer NNA the *alleged* right to unilaterally "elect … to cease selling or distributing Nissan Vehicles" to I-90 "by giving Dealer notice and such termination will be effective not less than one (1) year after such notice is given with twelve month prior notice." (DSSA, Standard Provisions at Section 12. Termination, F. Termination by Seller Because of a Change of Seller's Method of Distribution or Decision by Seller to Cease Distribution of Nissan Vehicles).

96.     The DSSA also expressly reserves the manufacturer NNA the *alleged* right "in its sole discretion to discontinue the supply … of any Nissan Product at any time." (DSSA, Standard Provisions at Section 7. Purchase and Delivery, G. Changes in Nissan Products.).

97.     NNA's discretionary power to establish, modify or terminate its product lines does not supersede the ODA's prohibition that a manufacturer cannot terminate, cancel, discontinue, or not renew I-90's Nissan Commercial Vehicle Dealers franchise agreement until at least October 8, 2021, and require NNA to provide I-90 with NV Cargo, NV Passenger, and

NV200 vans until October 8, 2021, because twelve-months' prior written notice is required by NNA's DDSA (Section 12.F.) and the ODA (R.C. 4517.541(A)).

98.     According to California contract law and the imposed covenant of good faith, since the DSSA grants NNA the discretionary power to affect the rights of I-90 regarding the products and termination of product lines, NNA must exercise its discretion in good faith and in accordance with fair dealing. *Powerhouse Motor Sports Group, Inc. v. Yamaha Motor Corporation* (Court of Appeal, Second Dist., Division 6, November 26, 2013), 221 Cal. App.4th 867, 164 Cal. Rptr. 3D 811.

99.     NNA breached the express contract terms to not terminate a product line without twelve-months' prior notice and further breached the covenant of good faith by attempting to terminate, cancel, discontinue, or not renew I-90's Nissan Commercial Vehicle Dealers franchise agreement and failing to provide I-90 with NV Cargo, NV Passenger, and NV200 vans, which is directly and proximately causing I-90 actual and consequential damages.

100.    As a direct and proximate result of NNA's actions, it is liable to I-90 for compensatory damages of at least $2,000,000.00, which should be determined by a jury.

## COUNT FOUR (Breach of Fiduciary Duty)

101.    I-90 incorporates all of the above paragraphs as if fully rewritten herein.

102.    NNA'S DSSA and resulting franchise relationship (1) places NNA in a position of disproportionate power and dominance over I-90, (2) requires I-90 to provide confidential and propriety information to NNA, creating a confidential relationship, and (3) makes I-90 dependent upon NNA for economic survival, forcing I-90 to repose special trust and confidence in NNA.

103.    The aforementioned effects of NNA's DSSA upon the relationship between NNA and I-90, and also the obligations NNA owes I-90 as a result of the comprehensive administrative ODA set forth in Revised Code Chapter 4517.01, additionally establish a fiduciary relationship between NNA and I-90 by the comprehensive statutory schemes regulating the new motor vehicle industry.

104.    The wrongful acts of NNA, as more-fully detailed above, include NNA's October 9, 2020, improper notice that NNA is terminating, canceling, discontinuing, or not renewing I-90's Nissan Commercial Vehicle Dealers franchise agreement; refusing to provide I-90 with NV Cargo, NV Passenger, and NV200 vans as required under the ODA; and refusing to pay I-90 for its NV Line franchise fair market value; parts, special tools, and signage; facility assistance for

the NV Line; and repurchase of unsold NV Line commercial vehicles. R.C. 4517.541 and R.C. 4517.542.

105. I-90 has have been damaged by NNA's breaches of its fiduciary duty in an amount to be determined at trial of this matter, including compensatory damages, exemplary damages, and attorneys' fees.

106. As a direct and proximate result of NNA's actions, it is liable to I-90 for compensatory exemplary damages, which both should be determined by a jury, plus reasonable attorneys fees, litigation expenses, and court costs.

WHEREFORE, Plaintiff I-90 is entitled to compensatory damages against NNA in double the amount of actual damages sustained, plus court costs and reasonable attorney fees pursuant to R.C. 4517.65(A) on Count One; declaration of I-90's rights and remedies under the ODA for NNA's improper actions of terminating I-90's Nissan Commercial Vehicle Dealer agreement on Count Two; compensatory damages against NNA on Count Three; and compensatory and exemplary damages in an amount to be determined at trial of this matter, plus attorneys' fees, litigation expenses, and court costs against NNA on Count Four; and any other monetary or equitable relief the Court deems appropriate to make I-90 whole.

Respectfully submitted,

Christopher M. DeVito (0047118)
ChrisMDeVito@gmail.com
**Morganstern, MacAdams & DeVito Co., L.P. A.**
623 West Saint Clair Avenue
Cleveland, OH 44113-1204
T: 216-687-1212 / Fax: 216-621-2951

*Attorney for Plaintiff I-90*

16

## JURY DEMAND

A trial by jury with the maximum number of jurors permitted under Ohio law is hereby requested.

Respectfully submitted,

Christopher M. DeVito (0047118)
ChrisMDeVito@gmail.com
**Morganstern, MacAdams & DeVito Co., L.P. A.**
623 West Saint Clair Avenue
Cleveland, OH 44113-1204
T: 216-687-1212 / Fax: 216-621-2951

*Attorney for Plaintiff I-90*

## INSTRUCTIONS FOR SERVICE

The Plaintiff hereby requests and instructs the Clerk of Courts of Lorain County, pursuant to Civil Rule 4.1, to serve a **Summons** with the enclosed **Complaint (With Jury Demand)**, via certified mail (or other approved form of delivery), upon the Defendant NNA at the following address:

Nissan North America, Inc.,
a Foreign California Company
c/o Its Statutory Agent
Corporation Service Company
50 west Broad Street, Suite 1330
Columbus, Ohio 43215

Respectfully submitted,

Christopher M. DeVito (0047118)
ChrisMDeVito@gmail.com
**Morganstern, MacAdams & DeVito Co., L.P. A.**

*Attorney for Plaintiff I-90*

Dated: July 8, 2021

17