UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MD AUTO GROUP, LLC, ) | CASE NO. 1:21-CV-1584 |
| ) | |
| ) | JUDGE CHARLES E. FLEMING |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | **AND ORDER** |
| ) | |
| NISSAN NORTH AMERICA, INC., ) | |
| ) | |
| Defendant. ) | |

Before the Court is Defendant Nissan North America, Inc.'s ("Defendant") motion for summary judgment against Plaintiff MD Auto Group, LLC ("Plaintiff") on all counts of Plaintiff's complaint ("Complaint").  (ECF No. 1; ECF No. 72).  Also pending is Plaintiff's amended motion for summary judgment on counts one and two of its Complaint.  (ECF No. 1-2, PageID #14–20; ECF No. 77).  For the reasons below, Defendant's motion for summary judgment is **GRANTED** as to all counts and Plaintiff's amended motion for summary judgment on counts one and two is **DENIED**.

I.     **FACTUAL BACKGROUND**

Plaintiff is a franchisee-dealer of vehicles as defined by O.R.C. § 4517.01(K) and (V) in the Ohio Motor Vehicle Dealer Act, codified in Chapter 4517 of the Ohio Revised Code ("OMVDA").  (ECF No. 1-2, PageID #8; ECF No. 11, PageID #55).  Plaintiff operates a Nissan dealership located in Sheffield, Ohio.  Defendant is a franchisor-manufacturer of vehicles as defined by O.R.C. § 4517.01(Q) and (W) of the OMVDA.  (*Id.*).  Defendant distributes Nissan motor vehicles, parts, and accessories in the United States through authorized dealers.  (ECF No. 72-1, PageID #1550).  Defendant requires dealerships be "Business Certified Dealers" to sell

1

certain commercial vehicles.  (*Id.* at PageID #1551; ECF No. 77, PageID #2059).  In 2010, under prior ownership, the Nissan dealership at issue became a Business Certified Dealer.  (ECF No. 72-1, PageID #1551; ECF No. 72-7, PageID #1594–99).  To qualify as a Business Certified Dealer, dealerships were required to have, among other things, two dedicated service bays, a 12,000-pound lift, and a dedicated Commercial Vehicle Accounts Manager ("CVAM").  (ECF No. 72-1, PageID #1551; ECF No. 72-7; ECF No. 77, PageID #2060).  Defendant required the interested dealerships to engage in a five-step process called the "LCV Business Certified Sign-Up Process."  (ECF No. 73-11; ECF No. 77, PageID #2064).  The process involved: (1) "Dealer Inquiry," (2) "Regional Approval," (3) "Facility Validation," (4) "Agreement Execution," and (5) "Dealer Activation." (*Id.*).  Business Certified Dealers executed a Nissan Commercial Vehicles Dealer Participation Agreement.  (ECF No. 84-12).  The Nissan dealership's prior owner executed a Nissan Commercial Vehicles Dealer Participation Agreement in 2010 and became qualified to sell certain Nissan vehicles.  (ECF No. 72-1, PageID #1551; ECF No. 72-7; ECF No. 84, PageID #2214).

In 2014, Plaintiff purchased an existing Nissan dealership and Defendant authorized Plaintiff as a Nissan motor vehicle dealer.  (ECF No. 72-1, PageID #1552; ECF No. 72-7, PageID #1594–99; ECF No. 72-9, PageID #1603; ECF No. 84, PageID #2212–13).  The parties do not dispute that all operational requirements to become a Business Certified Dealer were met when Plaintiff purchased the dealership.  (ECF No. 72-1, PageID #1551; ECF No. 72-7, PageID #1594–99; ECF No. 72-16, PageID #1687).  Plaintiff and Defendant did not execute a Nissan Commercial Vehicles Dealer Participation Agreement.  (ECF No. 72-1, PageID #1554).

On May 30, 2017, the parties entered a renewed Dealer Sales and Service Agreement ("DSSA") to allow Plaintiff to continue operating as a Nissan motor vehicle dealer.  (ECF No. 72-1, PageID #1552; ECF No. 84, PageID #2212–13).  The DSSA "sets forth: the rights which Dealer

will enjoy as an Authorized Nissan Dealer; the responsibilities which Dealer assumes in consideration of its receipt of these rights; and the respective conditions, rights and obligations of Seller and Dealer that apply to Seller's grant to Dealer of such rights and Dealer's assumption of such responsibilities." (ECF No. 72-12, PageID #1640; ECF No. 84-6, PageID #2273).  Article Fifth of the DSSA incorporates the Dealer Sales and Service Agreement Standard Provisions ("Standard Provisions") (collectively, the "Dealer Agreement").  (ECF No. 72-1, PageID #1552; ECF No. 72-9, PageID #1607; ECF No. 72-12, PageID #1641; ECF No. 77, PageID #2058).  The Standard Provisions outline key terms, definitions, and obligations of the parties.  (*See* ECF No. 72-14).

Pursuant to the Dealer Agreement, Defendant issued to Plaintiff a document titled "Product Addendum to Nissan Sales and Service Agreement" in April 2014 (the "Product Addendum").[1] (ECF No. 72-1, PageID #1553; ECF No. 72-3, PageID #1579; ECF No. 77, PageID #2058).  The Product Addendum authorized Plaintiff to purchase for resale several Nissan Cars and Nissan Trucks as defined in the Standard Provisions, including the NV200 at issue in this case.  (ECF No. 72-3, PageID #1579).  The Product Addendum stated that it "shall remain in effect unless and until superseded by a new Product Addendum" and canceled and superseded any previous Product Addendum, except for specified supplemental addenda, including "the supplemental NCV Product Addendum issued to a limited number of certified Nissan Commercial Vehicle Dealers."  (*Id.*).  Also pursuant to the Dealer Agreement, Defendant issued to Plaintiff a document titled

---

[1] The Standard Provisions define a Product Addendum to "mean the Product Addendum issued by Seller to Dealer which specifies those Nissan Vehicles which shall be offered for sale by Seller to Dealer for resale."  (ECF No. 72-14, PageID #1651).  The Product Addendum definition further states that "[s]eller reserves the right, in its sole discretion, to issue new, superseding Product Addenda to Dealer from time to time."  (*Id.*).  Section 1.D defines "Nissan Vehicles" as "Nissan Cars and Nissan Trucks."  (*Id.*).  Section 1.B defines "Nissan Cars" as "the new passenger cars specified in the current Product Addendum."  (*Id.*).  Section 1.C defines "Nissan Trucks" as "the new trucks, cabs and chassis, utility vehicles, buses, or vans specified in the current Product Addendum."  (*Id.*).

"Supplemental Product Addendum to Nissan Sales and Service Agreement" in August 2014 (the "Supplemental Product Addendum").   (ECF No. 72-4, PageID #1580-81; ECF No. 77, PageID #2060).  The Supplemental Product Addendum authorized Plaintiff to purchase for resale the NV Cargo and NV Passenger vehicles, in addition to the NV200 identified in the Product Addendum (collectively, the "NV vehicles").[2]   (ECF No. 72-4, PageID #1581; ECF No. 73-18, PageID #1835).

On October 9, 2020, Defendant sent a letter to Plaintiff and other dealers stating in "mid-2021, North American production of the [NV vehicles] vans will end."  (ECF No. 72-1, PageID #1555; ECF No. 72-17, PageID #1690; ECF No. 77, PageID #2083).  Defendant believed the NV vehicles "had reached the end of their life-cycle" due to a lack of technology required to comply with evolving regulatory requirements, including safety and emission control systems, and were no longer competitive in the market given the vehicles negative operating profit.  (ECF No. 72-1, PageID #1555; ECF No. 72-6, PageID #1588–89; ECF No. 73-25, PageID #1976).[3]  Defendant no longer manufactures any vans in North America.  (ECF No. 73-23, PageID #1899).

On November 20, 2020, Defendant provided a "one time allocation" to certain dealers titled "Nissan NV Final Dealer Allocation Formula" to provide financial assistance with the transition.  (ECF No. 72-1, PageID #1555; ECF No. 72-18, PageID #1692; ECF No. 77, PageID #2083).  Plaintiff declined.  (ECF No. 77, PageID #2083).  Since Defendant discontinued the NV vehicles,

---

[2] The NV200 vehicle was included in the Product Addendum provided to all retail Nissan dealerships.  (ECF No. 72-3, PageID #1579; ECF No. 73-24, PageID #1943–44).  The NV Passenger and NV Cargo vehicles were included in the Supplemental Product Addendum issued to Business Certified Dealers.  (ECF No. 72-4, PageID #1580–81; ECF No. 73-24, PageID #1943–44).

[3] Plaintiff points to the fact that Defendant's representative prepared an internal June 2020 business case study titled "NV/NV200 MY22 Proposal" that recommended the NV vehicles continue to be sold.  (ECF No. 91, PageID #2555).  This is not dispositive of the issue as to whether the NV vehicles were profitable.  Despite a marginal profit, the vans ultimately became a sunk cost and failed to meet performance expectations.  (*Id.*).  The NV vehicles annual operating costs remained negative.  (*Id.*).

4

Plaintiff continues to provide warranty service on the vehicles and has not made any changes to its facility because of the discontinuance.  (ECF No. 72-9, PageID #1610).  Plaintiff does not possess any unsold NV vehicles.   (ECF No. 72-9, PageID #1611).   Plaintiff remains active in the commercial vehicle market.  (ECF No. 72-16, PageID #1688).

## II.    PROCEDURAL HISTORY

On July 9, 2021, Plaintiff filed a Complaint against Defendant for violations of the OMVDA, declaratory judgment, breach of contract, and breach of fiduciary duty in the Lorain County Court of Common Pleas.  (ECF No. 1-2, PageID #8–24).  Defendant removed the case to this Court on August 13, 2021 under 28 U.S.C. § 1332.  (*Id.* at PageID #1).  Defendant filed an answer on August 20, 2021.  (ECF No. 11).

On June 9, 2023, Defendant moved for summary judgment on all claims.  (ECF No. 72). On the same date, Plaintiff moved for partial summary judgment on counts one and two.  (ECF No. 73).  On July 3, 2023, Plaintiff filed an amended motion for summary judgment.  (ECF No. 77).  On July 6, 2023, Plaintiff filed an unopposed motion to stay the case until August 7, 2023. (ECF No. 78).  The case was stayed.  (Order [non-document] dated 7/10/2023).  On August 9, 2023, Plaintiff opposed Defendant's motion for summary judgment.  (ECF No. 84).  On the same date, Defendant opposed Plaintiff's motion for partial summary judgment.  (ECF No. 83).  On August 23, 2023, both parties replied in support of their respective motions for summary judgment. (ECF Nos. 91, 92).   On September 6, 2024, Plaintiff filed a notice of supplemental authority. (ECF No. 105).  Defendant responded to that supplemental authority on September 10, 2024.  (ECF

No. 106).

## III.  LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it is "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 487 (6th Cir. 2006). A fact is material if "its resolution might affect the outcome of the suit under the governing substantive law." *Id*. The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619, 628 (6th Cir. 2018). Once the moving party satisfies its burden, the burden shifts to the non-moving party to produce evidence that demonstrates that there is a genuine dispute of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## IV.  DISCUSSION

### A.  Count 1 – Violations of O.R.C. §§ 5147.541 & 4517.59(A)(1)

Plaintiff alleges two violations of the OMVDA in count one of the Complaint. First, Plaintiff alleges Defendant violated O.R.C. § 4517.541, which governs notice requirements when a franchise is terminated. (ECF No. 1-2, PageID #14–18). Second, Plaintiff argues that Defendant violated O.R.C. § 4517.59(A)(1) by failing to act in good faith when the franchise was terminated. (*Id*. at PageID #18–19). The Court will address each alleged violation in turn.

#### 1.  Notice – O.R.C. § 4517.541

Plaintiff's principal argument is that Defendant violated O.R.C. § 5147.541 because it

discontinued the NV vehicles without providing 12 months' advance notice under O.R.C. § 4517.541.  (ECF No. 77, PageID #2080).  Plaintiff heavily relies on the remedial nature of Chapter 4517 to argue that O.R.C. § 4517.541, titled "termination of a franchise; notice," defines "franchise termination" as the discontinuance of a line-make.  (ECF No. 77, PageID #2075; ECF No. 91, PageID #2557).  In Plaintiff's motion for summary judgment, Plaintiff argues that the NV vehicles constituted a "line-make" as defined in O.R.C. § 4517.542(J)(2) because the NV vehicles were a collection of models, series, or a group of vehicles (*i.e.*, vans).  (ECF No. 77, PageID #2078).  Plaintiff submits the declaration of its expert, Patrick L. Anderson, whom Plaintiff alleges "expressly demonstrate[s] how Nissan and the industry standard categorize the [NV vehicles] as its own line-make[.]" (*Id*. at PageID #2069).

Plaintiff acknowledges that a franchise is separately defined in O.R.C. § 4517.01(U) but argues that the "franchise termination" definition in O.R.C. § 4517.541 is a more specific definition of a franchise that only requires the discontinuation of a line-make.  (ECF No. 84, PageID #2219).  Plaintiff argues that the Supplemental Product Addendum created a separate franchise in the NV vehicles as a matter of law.  (ECF No. 77, PageID #2078; ECF No. 91, PageID #2560).  Plaintiff sets forth the definition of a line-make and argues that the Supplemental Product Addendum is offered separately from the Product Addendum, thereby constituting both a line-make and a franchise under the OMVDA.  (*Id.* at PageID #2557–58).

Defendant disputes Plaintiff's interpretation, asserting that Plaintiff "conflates the statutory terms 'franchise' and 'line-make' and argues that [the NV vehicles] somehow constituted their own 'line-make' so that the discontinuation of the [NV vehicles] resulted in the termination of a 'franchise.'" (ECF No. 83, PageID #2111; ECF No. 92, PageID #2588–89).  Defendant asserts that a "franchise" and "line-make" hold different meanings under the OMVDA, and only if the

discontinuance of the sale of a line-make, series, brand, or class of vehicles results in the termination of a franchise are its obligations under the OMVDA triggered.  (ECF No. 92, PageID #2589).

Defendant rejects Plaintiff's interpretation that O.R.C. § 4517.541 is a "termination provision" applicable to any discontinued line-make.  (ECF No. 92, PageID #2589).  Defendant points to the definition of a franchise as defined at O.R.C. § 4517.01(U).  (*Id.*).  Based on that definition, Defendant argues that, even absent the NV vehicles, Plaintiff still holds a franchise as an authorized Nissan dealer under the Dealer Agreement.  (ECF No. 72-1, PageID #1550, 1556; ECF No. 83, PageID #2111; ECF No. 92, PageID #2588).  Defendant further argues that the Court need not determine whether the NV vehicles were a line-make because the language of O.R.C. § 4517.541 requires that a franchise exist and not solely that a line-make is discontinued.  (ECF No. 92, PageID #2596; ECF No. 83, PageID #2111).  Thus, Defendant asserts that the OMVDA did not require that Defendant give Plaintiff 12-months' notice before its discontinuance of the NV vehicles.  (*Id.* at PageID #2120).

### a.  The Plain Meaning of Section 4517.541

To determine whether Defendant violated O.R.C. § 4517.541, the Court must first determine whether it applies to the termination, cancelation, discontinuance, or non-renewal of a franchise, a line-make, or both.  To do so, the Court must interpret O.R.C. § 4517.541.  This case presents a matter of first impression for this Court.  The Court did not locate any Ohio courts interpreting O.R.C. § 4517.541 on this issue, nor has Plaintiff or Defendant cited any case authority.

Statutory interpretation is a matter of law.  *United States v. Dedman*, 527 F.3d 577, 584 (6th Cir. 2008).  In interpreting an Ohio statute, this Court must make the "best prediction, even in the

absence of direct state precedent, of what the [state] Supreme Court would do if it were confronted with [the] question." *Fackler v. Greenland Acquisition Co.*, No. 21-5989, 2023 WL 5955849, at *6 (6th Cir. Sept. 13, 2023) (citing *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (citations omitted)). To make its prediction, the Court's paramount concern is the legislature's intent in enacting the statute. *State ex rel. Steele v. Morrissey*, 815 N.E.2d 1107, 1111 (2004).

Chapter 4517 of the Ohio Revised Code governs the relationship between motor vehicle manufacturers and motor vehicle dealers that have entered into a franchise agreement. *Gen. Motors, LLC v. AutoSmart Chevrolet, Inc.*, 259 N.E.3d 686, 690 (Ohio Ct. App. 2024). It is true that Chapter 4517 "is remedial … to be liberally construed to promote said remedies and means." *Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 598 N.E.2d 1187, 1193 (1991); *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 530 F. App'x 542, 549 (6th Cir. 2013); *Kings Dodge, Inc. v. Chrysler Grp., LLC*, No. 1:12-CV-445, 2013 WL 6198307, at *9 (S.D. Ohio Nov. 27, 2013), *aff'd*, 595 F. App'x 530 (6th Cir. 2014). Even so, the Court's obligation to give effect to the legislature's chosen words without adding or deleting from the statutory language remains. *Columbia Gas Transmission Corp. v. Levin*, 882 N.E.2d 400, 406 (Ohio 2008). The remedial nature of Chapter 4517 "do[es] not allow [the Court] to alter the conventional meaning of a statute's terms" because "[g]iving effect to a statute's language is usually the best way to promote its object." *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 189 (6th Cir. 2017) (citations omitted) (analyzing O.R.C. § 4517.59).

The Court must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "Where the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions

9

therefrom." *Hubbard v. Canton City Sch. Bd. of Educ.*, 780 N.E.2d 543, 546 (Ohio 2002); *see also Kings Dodge, Inc.*, 2013 WL 6198307, at *10 (interpreting the plain language of the OMVDA to refrain from reading omitted language).

Statutes are to be construed as a whole to "give effect to every word and clause in it." *State ex rel. Myers v. Bd. of Educ. of Rural Sch. Dist. of Spencer Twp. Lucas Cnty.*, 116 N.E. 516, 517 (Ohio 1917). Statutory interpretation requires that "words in statutes should not be construed to be redundant, nor should any words be ignored." *E. Ohio Gas Co. v. Pub. Util. Comm.*, 530 N.E.2d 875, 879 (Ohio 1988). "No part should be treated as superfluous unless that is manifestly required, and the [C]ourt should avoid that construction which renders a provision meaningless or inoperative." *State ex rel. Myers*, 116 N.E. 516 at 517.

The plain language of O.R.C. § 4517.541 requires the existence of a franchise and does not necessarily require the existence of a line-make. O.R.C. § 4517.541 states:

(A) Each franchisor proposing to terminate, cancel, discontinue, or not renew a franchise based upon any of the following shall send written notice by certified mail of the proposed action to the franchisee at such time as may be necessary to ensure that the notice is received not later than twelve months before the effective date of the proposed action, unless prohibited by law or regulation:

***

(3) Discontinuance of the sale of a line-make, series, brand or class of vehicles or a change in distribution system by the manufacturer, whether through a change in distributors or the manufacturer's decision to cease conducting business through a distributor altogether.

Based on the literal reading of O.R.C. § 4517.541, the statute requires that a franchise exist and, in addition, that at least one of the circumstances enumerated in divisions (A)(1)-(3) be present. The statutory text expressly states that a "franchisor proposing to terminate, cancel, or not renew a *franchise* based upon any of the following shall send written notice … to ensure that the notice is received not later than twelve months before the effective date of the proposed action."

10

O.R.C. § 4517.541(A). Although divisions (A)(1)-(3) identify the specific conditions that trigger the 12 months' notice requirement, the existence of a franchise is independently required for each circumstance. Thus, before considering any of the specific conditions under divisions (A)(1)-(3), the Court must determine whether a franchise exists. *See Volvo GM Heavy Truck Corp. v. Key GMC Truck Sales, Inc.*, 773 F. Supp. 1033, 1040 (S.D. Ohio 1991) ("To prove [a violation of the OMVDA for cancelation of a Heavy-Duty Truck Addendum], [Plaintiff] must show, first, that the [Addendum] is a "franchise" … and second, that the franchise was terminated without good cause."). Only if a franchise exists will the Court determine whether the NV vehicles constituted a line-make under O.R.C. § 4517.541(A)(3) to warrant the 12 months' notice requirement.

The Court is not persuaded by Plaintiff's arguments. Plaintiff argues that O.R.C. § 4517.541(A)(3) operates as a specific definition of a franchise, such that the NV vehicles "line-make" constitutes a franchise. (ECF No 84, PageID #2218). Plaintiff relies on the rules of statutory interpretation and states that "the law requires when there is a conflict between a general statute and a more precise statute, the more precise statute should govern." (*Id.*). The Court disagrees. There is no conflict between O.R.C. §§ 4517.01(U) and 4517.541(A)(3). In fact, O.R.C. § 4517.01 expressly provides that its definitions, including the definition of a franchise set forth at Section 4517.01(U), applies to "sections 4517.01 to 4517.64" of the OMVDA. O.R.C. § 4517.01. Plaintiff's argument that a line-make constitutes a franchise would improperly render the word "franchise" in O.R.C. § 4517.541 superfluous and inoperative. *See State ex rel. Myers*, 116 N.E. 516 at 517.

Therefore, given that O.R.C. § 4517.541 independently requires the existence of a franchise, the Court first addresses whether a franchise existed in the NV vehicles to determine whether Defendant was required to provide 12-months' notice to Plaintiff before their

11

discontinuation.[4]

### b. *Existence of a Franchise Under O.R.C. § 4517.01(U)*

Plaintiff argues that it held a separate franchise in the NV vehicles which was terminated without proper notice under O.R.C. § 4517.541.  (ECF No. 77, PageID #2058).  In Plaintiff's view, it held a franchise in the NV200 and other vehicles identified in the Product Addendum, and another separate franchise in the NV Passenger and NV Cargo vehicles identified in the Supplemental Product Addendum.  (ECF No. 77, PageID #2068).  Plaintiff bases its position on its status as a Business Certified Dealer.   (*Id.* at PageID #2081).  Plaintiff explains that Business Certified Dealers were subject to certain requirements, including, among other things, two dedicated service bays, a 12,000-pound lift, and a dedicated CVAM.  (*Id.* at PageID #2060).

Plaintiff cites *Arthur Glick Truck Sales, Inc. v. Gen. Motors Corp.* 865 F.2d 494 (2d Cir. 1989) in its opposition to Defendant's motion for summary judgment.  Plaintiff relies on *Glick* for the proposition that whether a line of vehicles may constitute a separate franchise need not be determined on summary judgment.  *Id.* at 497–98.  In *Glick*, the court, having converted a motion to dismiss into a motion for summary judgment, held that the plaintiff-dealer was entitled to discovery and trial if necessary to determine whether the heavy-duty truck line was a separate franchise.  *Id.* at 497.  The Court instructed the determination to be based on: (1) the attributes of a franchise under New York's Franchised Motor Vehicle Dealer Act, including whether there is a

---

[4] The Court limits its analysis of whether a franchise existed to the written documents between the parties.  Plaintiff relies on *Car Bus., Inc. v. Fleetwood Motor Homes of Indiana, Inc.*, 492 N.E.2d 488 (Ohio Ct. App. 1985) to argue that a franchise may be created by oral understanding under the OMVDA, which includes "any written agreement, contract, or understanding."  The Court disagrees.  O.R.C. § 4517.63 states: "All actions of the franchisor … with respect to the creation, modification, interpretation, or termination of the franchise, or failure to renew or extend the franchise … shall be in writing and signed by the authorized representative of the franchisor."  The Ohio Motor Vehicle Dealers Board expressly disagreed with *Car Business* and held that, under O.R.C. § 4517.63, any agreement, contract, or understanding must be written. *See Camper Care, Inc. v. Forest River, Inc.*, Report and Recommendation, Case No. 05-08-MVDB-311-D, at 5 (Aug. 24, 2006).  The Court gives deference to the Ohio Motor Vehicle Dealers Board and agrees that O.R.C. § 4517.63 requires a franchise be created by written agreement, contract, or understanding, and not orally.

community of interest in marketing of the trucks, and (2) the fact that GMC did not fully withdraw from the heavy-duty truck business and retained a percentage of control of the joint venture. *Id.*

The court began its analysis with New York's Franchised Motor Vehicle Dealer Act, which defines a franchise as "a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto." *Id.* at 496. Based on the definition of a franchise, the court created a test to determine whether the heavy-duty trucks constituted a separate franchise: "[w]here a dealer has made an investment in parts and training service employees and where the line of trucks is functionally related to a distinct segment of the market, as heavy-duty trucks appear to be, and where their sale constitutes a substantial part of the dealer's revenues, it may be that the dealer has been given a 'franchise.'" *Id.* at 497. Plaintiff briefly cites to *Maier-Schule GMC v. GMC Truck & Bus. Grp.*, No. 87-CV-1514, 1993 U.S. Dist. LEXIS 21728 (W.D.N.Y. May 3, 1993) in support of its position, a decision in a lower court of the Second Circuit decided after *Glick*, for the same proposition that summary judgment be denied as to whether a product addendum creates a franchise. (ECF No. 84, PageID #2221).

In addition, Plaintiff relies on *Gen. Motors Corp. v. Gallo GMC Truck Sales, Inc.*, 711 F. Supp. 810 (D.N.J 1989) in its reply to its own motion for summary judgment. In *Gallo*, the District Court of New Jersey examined whether a separate franchise existed in heavy-duty trucks under the New Jersey Franchise Practice Act ("NJFPA"). *Id.* at 813–14. The NJFPA defined a franchise as "a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in

13

which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." *Id.* at 813.

Given the statutory language of the NJFPA, the court explained a "community of interest" existed in the marketing and servicing of the GMC heavy-duty trucks. *Id.* at 815. The court added that the dealer agreement alone did not provide for a community of interest in and of itself because the addendum was required for any heavy-duty trucks to be sold. *Id.* The dealer agreement governing the parties gave plaintiff the right to buy and resell vehicles identified in the "Addendum" (in the singular), which led the court to conclude that the parties intended the dealer agreement to consist of one main agreement plus the addendum. *Id.* In turn, this resulted in multiple franchises for each addendum of light, medium, and heavy-duty trucks. *Id.*

Plaintiff argues that *Gallo* is persuasive as to the proposition that a separate franchise exists under multiple addenda when the governing dealer agreement identifies of a single product addendum. Under Plaintiff's view, "three addendums to a dealer agreement constitute[] three franchises." (ECF No. 91, PageID #2559). Plaintiff argues that the Dealer Agreement in the present case similarly identifies a single "Product Addendum." (*Id.*). Under Plaintiff's interpretation, the Supplemental Product Addendum created a separate franchise given that the language of the Dealer Agreement identified one addendum, and not "addendum(s)" or "addenda." (*Id.*). Plaintiff further relies on *Everything Cycles, Inc. v. Yamaha Motor Corp., U.S.A., Inc.*, Case No. 07-1434 (D. Oregon May 22, 2008) for the proposition that the spirit of the dealer agreement and protections afforded by the OMVDA would be violated if the Court were to construe the Dealer Agreement to allow Defendant to discontinue an entire vehicle line, like the NV vehicles, so long as one addendum existed. (ECF No. 91, PageID #2560).

Defendant argues that it did not terminate Plaintiff's franchise by discontinuing the NV vehicles because the Supplemental Product Addendum did not create a separate franchise. (ECF 72-1, PageID #1560). Under Defendant's view, Plaintiff held one franchise under the Dealer Agreement, Product Addendum, and Supplemental Product Addendum. (*Id.*). Defendant asserts that Plaintiff's franchise still exists after the discontinuation of the NV vehicles identified in the Supplemental Product Addendum because Plaintiff continues to operate under the Dealer Agreement, sell Nissan vehicles identified in the Product Addendum, and provide warranty service on Nissan vehicles, including the NV vehicles. (*Id.*). Defendant further asserts that the Supplemental Product Addendum indicated that it was issued as part of—and not a change to— the Dealer Agreement. (*Id.* at PageID #1561). Rather, the Supplemental Product Addendum updated the existing product addenda authorized by the Dealer Agreement. (*Id.*). Defendant ultimately contends that Plaintiff "continues to sell and service Nissan vehicles under the only Dealer Agreement that ever existed between the parties." (*Id.* at PageID #1558).

Defendant primarily relies on *Cent. GMC, Inc. v. General Motors Corp.*, 946 F.2d 327 (4th Cir. 1991), which reversed and remanded judgment for franchisee-dealer and applied a different approach than *Glick* and *Gallo* as to whether a product addendum constituted a separate franchise. Like other courts faced with whether a separate franchise existed in the sale of heavy-duty trucks, the *Central* court analyzed the definition of a franchise under the Maryland Transportation Code ("MTC"). *Id.* at 331. The MTC defines a franchise as "a written arrangement, whether or not for a definite period, in which a manufacturer, distributor, or factory branch grants to a dealer or distributor a license or right to use a trade name, trademark, service mark, or related characteristic in the sale, leasing, or servicing of new vehicles." *Id.*

The *Central* court explained that one agreement—the Dealer Sales and Service Agreement—governed the relationship between Central and GMC. *Id*. The Dealer Sales Agreement granted Central the right to sell all trucks distributed to Central under a single trade name, "GMC Truck." *Id*. This alone indicated that Central had one statutory franchise in GMC trucks and the heavy-duty truck addenda was a constituent part of the whole Dealer Sales and Service Agreement, not a separate agreement. *Id*. The *Central* court expressly stated that "Defendant simply exaggerate[d] the legal significance of the addenda," which were subsidiary to the main contract and changed when model offerings varied. *Id*. Indeed, "both before and after the heavy duty truck models were discontinued, Central identified itself as a GMC Truck dealer" and Central's rights under the Dealer Sales and Service Agreement remained intact. *Id*. at 331–332. Defendant argues that *Central* applies and Plaintiff held only one franchise in NV vehicles, which remains after the NV vehicles are discontinued. (ECF No. 72-1, PageID #1556, 1558; ECF No. 72-9, PageID #1609, ECF No. 72-16, PageID #1688). Defendant argues that it was not required to provide 12-months' notice because it did not terminate a franchise by discontinuing the NV vehicles. (ECF No. 72-1, PageID #1558; ECF No. 83, PageID #2120).

Plaintiff and Defendant rely on persuasive and non-binding authority from outside this circuit. Plaintiff and Defendant rely on primarily on three cases: *Glick*, *Gallo*, and *Central*. Each case arises from lawsuits against defendant-manufacturer GMC after GMC discontinued its heavy-duty trucks. *Central*, 946 F.2d at 330; *Glick*, 865 F.2d at 496; *Gallo*, 711 F. Supp. at 812. GMC discontinued the heavy-duty trucks after suffering substantial financial loss. *Central*, 946 F.2d at 329. To reduce its loss, GMC purported to withdraw from the heavy-duty truck market and entered a joint venture with Volvo. *Central*, 946 F.2d at 329; *Glick*, 865 F.2d at 496; *Gallo*, 711 F. Supp. at 812. Yet, and of concern to some courts, GMC continued to manufacture its Brigadier heavy-

16

duty truck and marketed it through the joint venture, seemingly remaining in the heavy-duty truck market. *Central*, 946 F.2d at 329; *Glick*, 865 F.2d at 496; *Gallo*, 711 F. Supp. at 812. In each case, the courts determined whether plaintiff-dealers held separate franchises in GMC's heavy-duty trucks. For the reasons below, the Court finds the reasoning articulated in *Central* instructive and persuasive. The Court's concludes that Plaintiff did not have a separate franchise in the NV vehicles.

To analyze whether Plaintiff held a separate franchise under the Supplemental Product Addendum, the Court begins with the plain language of the OMVDA. The OMVDA defines a franchise as "any written agreement, contract, or understanding between any motor vehicle manufacturer or remanufacturer engaged in commerce and any new motor vehicle dealer that purports to fix the legal rights and liabilities of the parties to such agreement, contract, or understanding." O.R.C. § 4517.01(U).

The Court begins with the three documents at issue: (1) the Dealer Agreement, (2) the Product Addendum, and (3) the Supplemental Product Addendum. As to the first, and as in *Central*, the Dealer Agreement governs the relationship between Plaintiff and Defendant and constitutes a franchise under applicable law. The Dealer Agreement constitutes a written agreement between Defendant, as a motor vehicle manufacturer, and Plaintiff, a new motor vehicle dealer. (ECF No. 72-12). The Dealer Agreement grants Plaintiff the right to sell Nissan vehicles distributed by Defendant under the trademark "Nissan," just as the agreement in *Central* authorized Central the right to sell trucks distributed under the tradename "GMC Truck." (*Id.*; ECF No. 72-14, PageID #1652). Article Fifth of the DSSA "appoints Dealer as an Authorized Nissan Dealer" and "grants Dealer a non-exclusive right … to identify itself as an Authorized Nissan Dealer, to display the Nissan Marks in the conduct of its Dealership Operations and to use

the Nissan Marks in the advertising, promotion and sale of Nissan Products in the manner provided for in this Agreement." (ECF No. 72-12, PageID #1641). The Standard Provisions defines "Nissan Marks" to include "trademarks, service marks, names, logos and designs that Seller may, from time to time, use or authorize for use by Dealer in connection with Nissan Products or Dealership Operations including, without limitation, the name 'Nissan.'" (ECF No. 72-14, PageID #1652). The Dealer Agreement provides Plaintiff—without limitation—the right to use the name "Nissan." (*Id.*). Thus, the Dealer Agreement constitutes a franchise under O.R.C. § 4517.01(U).

As to the Product Addendum and Supplemental Product Addendum, each addendum is a constituent part of the Dealer Agreement.[5] Neither the Product Addendum nor the Supplemental Product Addendum are separate agreements from the Dealer Agreement. This is apparent for several reasons.

First, the express terms of the Supplemental Product Addendum and its corresponding cover letter states that it is an addition to, and not substitute for, the DSSA. The cover letter provided with the Supplemental Product Addendum states: "The issuance of a supplemental addendum is not a change to the Dealer Agreement but rather an update to the existing product addenda as provided for within the Agreement. This update is being conducted pursuant to Section 1.X., of the Standard Provisions of your Sales & Service Agreement, by which Nissan may issue new, superseding Product Addenda to you from time to time." (ECF No. 72-4, PageID #1580). The cover letter continues: "Please keep the enclosed supplemental Product Addendum with your Sales & Service Agreement." (*Id.*). Even further, the Supplemental Product Addendum itself states: "This Supplemental Product Addendum is in addition to any other currently effective

---

[5] The Supplemental Product Addendum is authorized under the Dealer Agreement. The Standard Provisions clarifies in the Product Addendum definition that it is to "specif[y] those Nissan Vehicles which shall be offered for sale by Seller to Dealer for resale." (ECF No. 72-14, PageID #1652). The Supplemental Product Addendum does just that; it includes the NV vehicles for sale by Defendant to Plaintiff for resale.

Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement." (*Id*. at PageID #1581; ECF No. 73-18, PageID #1837).  The plain language of the Supplemental Product Addendum and its corresponding cover letter evidences it was a constituent part of the whole Dealer Agreement, the Standard Provisions, and the previously issued Product Addendum. Given the plain language of the Supplemental Product Addendum, to hold otherwise would diverge from its terms.

Second, the parties do not dispute that "both before and after the [NV vehicles] were discontinued, [Plaintiff] identified itself as a [Nissan] dealer." *See Central*, at 331–32; (ECF No. 72-1, PageID #1556, 1558; ECF No. 72-9, PageID #1609, ECF No. 72-16, PageID #1688).  This makes sense for several reasons.  The Dealer Agreement granted Plaintiff the right to purchase and sell for resale "Nissan Vehicles" which include passenger cars, trucks, cabs, and chassis, utility vehicles, buses, or vans.  (ECF No. 72-14, PageID #1651).  The purchase and resale of the Nissan passenger vans were contemplated and expressly included in the Dealer Agreement.  It does not logically follow that the Supplemental Product Addendum would create a separate franchise in a "van" that is already expressly provided for in the Dealer Agreement.  Further, the parties agree that Plaintiff still operates as a franchise under the Dealer Agreement, even after the discontinuation of the NV vehicles and termination of the Supplemental Product Addendum.  That is because, as Defendant accurately states, "[a]bsent the Dealer Agreement, the Supplemental Product Addendum fixes no 'legal rights and liabilities of the parties to such agreement, contract, or understanding.'" (ECF No. 72-1, PageID #1562).  Plaintiff is still an authorized Nissan dealer, continues to purchase and resell other vehicles authorized in the Product Addendum and other Supplemental Addenda, and continues to service the NV vehicles.  (ECF No. 72-16, PageID #1688–89).  Thus, as held in *Central*, Plaintiff did not have separate franchise in the NV vehicles.

The Court finds *Glick* and *Gallo* to be unpersuasive for several reasons.[6]  First, and importantly, the applicable statutes in *Glick* and *Gallo* define a franchise in different terms than the OMVDA, each requiring a "community of interest" in the marketing and sale of motor vehicles for a franchise to exist.  *See* N.Y. Veh. & Traf. Law § 462; *Glick*, 865 F.2d at 496 (defining a franchise as "a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto."); N.J.S. § 56:10-3(a); *Gallo*, 711 F. Supp. at 813 (defining a franchise as "a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.").

The OMVDA does not require a "community of interest in the marketing of [NV vehicles] and related services" to create a franchise.  *Glick*, 865 F.2d at 497.  The same was true in *Central*. *Compare Md. Code Ann. Transp.* 11-125 ("'Franchise' means a written agreement, whether or not for a definite period, in which a manufacturer … grants to a dealer or distributor a license or right to use a trade name, trademark, service mark, or related characteristic in the sale, leasing, or servicing of new vehicles.") *with* Ohio Rev. Code 4517.01(U) ("'Franchise' means any written agreement, contract, or understanding between any motor vehicle manufacturer … and any new

---

[6] The Court similarly considers the other cases briefly mentioned by Plaintiff as unpersuasive.  *See* (ECF No. 91, PageID #2546); *C-B Kenworth, Inc. v. Gen. Motors Corp.*, 706 F. Supp. 952, 954 (D. Me. 1988) (holding evidence presented as insufficient to determine whether separate franchises existed on a motion to dismiss converted to a motion for summary judgment); *Mid-State Truck Serv. Inc. v. Gen. Motor Corp.*, No. 87-C995-S, 1988 WL 148432, at *7 (acknowledging "concern for adding a new level of uncertainty as to franchise agreements.").  The parties in this case have exchanged voluminous discovery and moved for summary judgment.  The Court shares similar concern for adding a new level of uncertainty to franchise relationships and declines to do so.

motor vehicle dealer that purports to fix the legal rights and liabilities of the parties to such agreement, contract, or understanding.").

Second, *Glick* and *Gallo* are procedurally and factually distinguishable from this case. The court in *Glick* construed a motion to dismiss as a motion for summary judgment and merely held that the dealer was entitled to discovery before the court could determine whether a franchise existed and was terminated. That is not the case here. This case has been pending before the Court since 2021, extensive discovery spanned nearly eighteen months, and the parties have each separately moved for summary judgment. (*See* ECF No. 60, 64; ECF No. 92, PageID #2594). Further, neither *Glick* nor *Gallo* involved product addenda similar to the Supplemental Product Addendum at issue. The Supplemental Product Addendum expressly stated that it was not to be viewed as a separate agreement, but an addition to the Dealer Agreement and Product Addendum. (ECF No. 72-4, PageID #1580–81). Such language does not exist in addenda analyzed in *Glick* or *Gallo*.

The Court is also unpersuaded by Plaintiff's remaining arguments to support the existence of a separate franchise. Plaintiff cites the test set forth in *Glick* to argue that it held a separate franchise in the NV vehicles. (ECF No. 84, PageID #2220). But Plaintiff cannot meet the *Glick* test. Plaintiff did not invest in parts and training of service employees nor provide any evidence that the NV vehicle sales constitute a substantial part of its revenues. *Glick*, 865, F.2d at 497–98. Plaintiff merely alleges that, by volume, the NV vehicle sales accounted for approximately 95% of commercial use across all dealers. (ECF No. 72-9, PageID #1610). Further, Plaintiff repeatedly references the five-step process to become a Business Certified Dealer. (ECF No. 73-18, PageID #1845–46; ECF No. 77, PageID #2059; ECF No. 84, PageID #2212; ECF No. 91, PageID #2553). Yet, Plaintiff overlooks the fact that, at the time of purchase of the dealership, Plaintiff purchased,

resold, and serviced the NV vehicles, and any requirements to be a Certified Business Dealer were already satisfied. (ECF No. 72-1, PageID #1551; ECF No. 72-16, PageID #1687). Plaintiff purchased the dealership with dedicated bays, a lift capable of lifting vehicles over 12,000 pounds, the tools required to service the NV vehicles and employed a CVAM. (ECF No. 72-9, 1605). Thus, it cannot be said that Plaintiff itself made an investment into parts and training of service employees for the NV vehicles.

Plaintiff still advertises, purchases, and resells other standard vehicles and commercial vehicles, including the Frontier and Titan trucks. (ECF No. 72-16, PageID #1689). Plaintiff emphasizes that Business Certified Dealers were offered different incentives and were assessed differently than retail dealers. (ECF No. 73-13, PageID #1913–16). But all dealers had different incentive programs, including the standard retail dealers. (*Id.*). It is logical for a franchisor-manufacturer to assess specific vehicles and dealers differently. Further, Plaintiff did not make any changes to its dealership or the employment of technicians, like CVAMs, as a result of the discontinuation of the NV vehicles. (ECF No. 72-9, 1610). The only change Plaintiff made to the dealership since its purchase that is related to the NV vehicles is an upgrade to an alignment machine, which Plaintiff admits is used for other Nissan vehicles, and not exclusively the NV vehicles. (ECF No. 72-9, PageID #1606; ECF No. 72-16, PageID #1687). Plaintiff also stated that it has unused space because of the NV vehicles discontinuance, but Plaintiff seemingly admits this is at least partially due to "not having a supply of other Nissan products." (ECF No. 72-16, PageID #1687). Plaintiff appears to have used certain tools, like the alignment machine, across the board on all its Nissan products. Plaintiff also still uses a CVAM. The Court fails to understand how Plaintiff cannot use the dedicated service bays, the 12,000-pound lift, or space previously used for the NV vehicles for other Nissan vehicles it currently sells.

22

Therefore, the Court finds that Plaintiff did not hold a separate franchise in the NV vehicles through the Supplemental Product Addendum.  Given the Court's decision that a franchise is required to invoke the notice requirement under O.R.C. § 4517.541, and because no franchise existed in the NV vehicles, the Court need not address whether the NV vehicles constituted a line-make.[7]

### 2. Good Faith – O.R.C. § 4517.59(A)(1)

Plaintiff argues that Defendant did not terminate the NV line of commercial vehicles in good faith because 1) the NV line was profitable, 2) upper-level management knew of the discontinuation of the NV line long before they notified dealers, and 3) the money offered to the dealerships was an attempt to evade their legal responsibilities.  (ECF No. 77, PageID #2082). Plaintiff further argues that Defendant's financial offer was not fair or reasonable given the financial investments and loss of profits suffered from the discontinuance of the NV vehicles. (ECF No. 91, PageID #2561).

Defendant argues that its "decision to discontinue the production and distribution of the [NV vehicles] was made in good faith and justified by legitimate business reasons."  (ECF No. 72-1, PageID #1555).  Defendant argues that O.R.C. § 4517.54(A)—not § 4517.59(A)—governs its good faith obligation, and Defendant could not have violated the statute because it did not discontinue a franchise.  (*Id.* at PageID #1563).  Defendant argues that "[e]ven if [4517.59(A)(1)] applied … a dealer cannot complain that a manufacturer violated its duty of good faith simply by

---

[7] Plaintiff seemingly relies on testimony from Patrick L. Anderson to suggest the NV vehicles were a separate line-make which constitutes a franchise.  (ECF No. 91, PageID #2558).  But Patrick L. Anderson's declaration indicates that its single purpose is "to state one specific finding … that Nissan's NV commercial vans are 'a line-make, series, brand, or class of vehicle' as those terms are used within the automobile industry."  (ECF No. 73-2, PageID #1732). Patrick L. Anderson does not speak on the issue of whether a franchise existed.  Thus, even if the Court accepted Patrick L. Anderson's testimony, it may only be considered as to whether the NV vehicles constitute a line-make. Given that a franchise does not exist, and the Court will not address whether the NV vehicles constituted a line-make, the Court need not consider whether to accept Patrick L. Anderson's testimony.

exercising a contractual right." (*Id.* at PageID #1563).  Instead, Defendant argues that Plaintiff must offer evidence that its conduct was not commercially justified.  (*Id.*).

Plaintiff rejects Defendant's arguments, alleging that it need not offer evidence that a manufacturer's conduct was not commercially justified.[8]  (ECF No. 84, PageID #2223–24). Plaintiff generically argues that "[Defendant's] ability to exercise contractual rights cannot run afoul of established Ohio law" given that "[t]he OMVDA … protect[s] dealers against manufacturers practicing 'abusive and unfair franchise practices' over dealers."  (*Id.*).

The OMVDA requires manufacturers to act in good faith towards dealers.  "Good faith" is defined under the OMVDA to require "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade … including, but not limited to, the duty to act in a fair and equitable manner." O.R.C. § 4517.01(AA).  This definition cross-references the definition of "good faith" under Article 1 of Ohio's Uniform Commercial Code, which is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." O.R.C. § 1301.201(20).  The Sixth Circuit further interprets the OMVDA's good faith provisions to require manufacturers treat dealers in "'commercially justifiable' ways." *Franklin Park Lincoln-Mercury, Inc.*, 631 F. App'x at 273 (quoting *Master Chem. Corp. v. Inkrott*, 563 N.E.2d 26, 31 (Ohio 1990)).

O.R.C. § 4517.59(A)(1) prohibits a franchisor from failing to act in good faith by (1) "acting or purporting to act under the terms, provisions, or conditions of a franchise," or (2) "in terminating, canceling, or failing to renew a franchise."  Defendant, as franchisor, was bound to be honest in fact and observe reasonable commercial standards free from coercion, intimidation,

---

[8] Plaintiff refers to an opinion it claims to be of this Court, when, in reality, it is the opinion of another court.  (ECF No. 84, PageID #2223).  This Court has not previously rejected Defendant's argument that Plaintiff must offer evidence that Defendant's conduct was not commercially justified.

or threat.  O.R.C. § 4517.01(AA); *Bill Call Ford, Inc. v. Ford Motor Co.*, 830 F. Supp. 1053, 1059 (N.D. Ohio 1993), *aff'd,* 48 F.3d 201 (6th Cir. 1995).

As to the first prong of O.R.C. § 4517.59(A)(1), Defendant acted in good faith by "acting or purporting to act under the terms, provisions, or conditions of a franchise."  Plaintiff cannot dispute that Defendant exercised its right under Dealer Agreement.  Section 7.G expressly allowed Defendant to discontinue any Nissan product, including the NV vehicles, at any time.  (ECF No. 72-14, PageID #1667).  Defendant set forth the reasons behind its decision to discontinue the NV vehicles, including the impact on its business revenue and the public at large.  (ECF No. 72-6, PageID #1588).  Not only did the NV vehicles have a negative operating revenue and fail to perform according to expectations, but the NV vehicles also lacked technology to maintain certain safety requirements.  (*Id*.).

As to the second prong of O.R.C. § 4517.59, Defendant similarly did not fail to act in good faith "in terminating, canceling, or failing to renew a franchise."  As the Court explained, Plaintiff did not have a separate franchise in the NV vehicles which was terminated, canceled, or not renewed.  Therefore, the Court finds that Defendant did not violate O.R.C. § 4517.59(A)(1) by failing to act in good faith.

Accordingly, Plaintiff's motion for summary judgment on count one of the Complaint is hereby **DENIED**.  Defendant's motion for summary judgment on count one of the Complaint is **GRANTED**.

### B.  Count 2 – Declaratory Judgment as to Violations of O.R.C. §§ 5147.541 & 4517.59(A)(1)

Plaintiff seeks declaratory judgment in count two of the Complaint as to Defendant's alleged violations of O.R.C. §§ 4517.541 and 4517.542.  (ECF No. 1-2, PageID #20).  Plaintiff requests that the Court 1) declare that Defendant violated O.R.C. §§ 4517.541 and 4517.542 by

25

"failing to give the required twelve-months' written notice prior to discontinuing and terminating its commercial vehicle line of vehicles and the Nissan Commercial Vehicle Dealer agreement" with Plaintiff; 2) declare that Defendant violated O.R.C. §§ 4517.541 and 4517.542 by failing to pay Plaintiff the fair market value of its Nissan Commercial Vehicle Dealer agreement as valued on October 8, 2020; 3) declare that Defendant violated O.R.C. §§ 4517.541 and 4517.542 by failing to pay Plaintiff for "the special tools, signage, parts, new commercial vehicle inventory, and twelve months of rent as facility assistance"; and 4) declare that Defendant violated O.R.C. § 4517.59(A)(1) by failing to act in good faith when "purporting to act under the franchise agreement and/or discontinuing, terminating, canceling, or failing to renew a franchise."  (ECF No. 77, PageID #2084–85).

Defendant opposes Plaintiff's motion for summary judgment and separately moves for summary judgment on count two.  (ECF No. 72-1, PageID #1558; ECF No. 83, PageID #2128–29).  Defendant asserts that it did not violate O.R.C. §§§ 4517.541, 4517.542, or 4517.59(A)(1) because it did not discontinue or terminate a franchise, and Plaintiff is not entitled to declaratory judgment.  (ECF No. 83, PageID #2128).  In opposition, Defendant further argues that Plaintiff's declaratory judgment claim is duplicative of its statutory claims under count one and is improper given that Plaintiff's claims have fully ripened.  (*Id.* at PageID #2129).

The Declaratory Judgment Act, 28 U.S.C. § 2201, allows federal courts to issue a judgment declaring the rights and legal relationships of the parties, but it does not provide an independent cause of action.  *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).  "A request for declaratory judgment must accompany the substantive claim for which declaratory judgment is sought."  *Days Inn Worldwide, Inc. v. Sai Baba, Inc.*, 300 F. Supp. 2d 583, 592–93 (N.D. Ohio 2004) (citation

omitted).  This is because a declaratory judgment is a remedy and not an independent claim. *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 587 (6th Cir. 2021) ("Injunctive relief is not a cause of action, it is a remedy") (internal quotation marks and citation omitted).

The Court has held that Plaintiff did not violate O.R.C. §§ 4517.541 or 4517.59.  Defendant did not terminate a franchise when it discontinued the NV vehicles and was not required to provide 12-months' notice to Plaintiff.  Nor did Defendant fail to act in good faith in terminating, canceling, or failing to renew a franchise, because none separately existed for the NV vehicles.  Consequently, 4517.542 is inapplicable.  Defendant was not required to compensate Plaintiff with the fair market value of its Nissan Commercial Vehicle Dealer Agreement as valued on October 8, 2020, nor pay for any special tools, signage, parts, new commercial vehicle inventory, or twelve months of rent as facility assistance.  Given that Plaintiff's claims under O.R.C. §§§ 4517.541, 4517.542, and 4517.59 fail, Plaintiff's claim for declaratory judgment also fails because it cannot survive as a standalone claim.

Accordingly, Plaintiff's motion for summary judgment on count 2 of the Complaint for declaratory judgment is hereby **DENIED**.  Defendant's motion for summary judgment on count 2 of the Complaint for declaratory judgment is **GRANTED**.

### C.  Count 3 – Breach of Contract and Implied Covenants

Plaintiff alleges breach of contract and implied covenants in count three of the Complaint. (ECF No. 1-2, PageID #20–22).  Plaintiff alleges that Defendant breached the Dealer Agreement by terminating a product line without twelve months prior notice and breached the covenant of good faith by "attempting to terminate, cancel, discontinue, or not renew I-90's Nissan Commercial Vehicle Dealers franchise agreement and failing to provide I-90 with NV Cargo, NV

Passenger, and NV200 vans." (*Id*. at PageID #22). Plaintiff specifically alleges that Defendant

violated Section 12.F[9] of the Dealer Agreement. (*Id*. at PageID #21).

Defendant contends that it did not violate Section 12.F of the Dealer Agreement because

Plaintiff continues to sell and service Nissan vehicles and Plaintiff's proposed reading of the Dealer

Agreement would read out Section 7.G[10] entirely, which allows Defendant to discontinue the

supply of any "Nissan Product" at any time. (ECF No. 72-1, PageID #1565–66). Plaintiff

interprets Section 12.F as requiring Defendant to give dealers 12 months of notice if Defendant

"should discontinue or terminate its method of distributing any Nissan Vehicles." (ECF No. 84,

PageID #2225). Defendant argues that the provision in Section 12.F is only triggered if Defendant

ceases selling or distributing all "Nissan Vehicles." (ECF No. 92, PageID #2601). Defendant also

notes that the statutory terms of the OMVDA that Plaintiff cites in support of breach of contract

do not control the contractual provisions at issue in the Dealer Agreement. (*Id*.).

Both parties agree that California law governs the contractual relationship between the

parties. (ECF No. 1-2, PageID #20; ECF No. 72-1, PageID #1564). Under California law, the

---

[9] Section 12.F of the Standard Provisions of the DSSA states, "[i]f Seller should elect or be required to discontinue its present method of distributing Nissan Vehicles, or if Seller should elect or be required to cease selling or distributing Nissan Vehicles, Seller may terminate this Agreement by giving Dealer notice and such termination will be effective not less than one (1) year after such notice is given." (ECF No. 72, PageID #1674). Section 1.D defines "Nissan Vehicles" as "Nissan Cars and Nissan Trucks." (*Id*. at PageID #1651). Section 1.B defines "Nissan Cars" as "the new passenger cars specified in the current Product Addendum." (*Id*.). Section 1.C defines "Nissan Trucks" as "the new trucks, cabs and chassis, utility vehicles, buses, or vans specified in the current Product Addendum." (*Id*.). Section 1.X defines "Product Addendum" as "the Product Addendum issued by Seller to Dealer which specifies those Nissan Vehicles which shall be offered for sale by Seller to Dealer for resale. Seller reserves the right, in its sole discretion, to issue new, superseding Product Addenda to Dealer from time to time." (*Id*. at PageID #1652).

[10] The initial briefing cites Section 17.F (ECF No. 72, PageID #1566), but the reply brief clarifies that Defendant is referencing Section 7.G. (ECF No. 92, PageID #2601).

Section 7.G of the Standard Provisions of the DSSA states, "Seller shall have the right in its sole discretion to discontinue the supply, or make changes in the design or component materials, of any Nissan Product at any time. Seller shall be under no liability to Dealer on account of any such changes and shall not be required as a result of any such changes to make any changes to Nissan Products previously purchased by Dealer." (*Id*. at PageID #1667).

elements of breach of contract are, "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC, v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). The Court may consider whether a contract is ambiguous at the summary judgment stage because that is a question of law under California law. *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 692 (9th Cir. 1992).

The reading of Section 12.F that Plaintiff asks this Court to adopt reads the word "any" into the contract language where it does not exist. The Court declines to do so. A fundamental principle of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. Cal. Civ. Code § 1636. If a contracts plain language "is unambiguous, a court may not 'read into' the document additional terms in order to conform its meaning." *PV Little Italy, LLC v. MetroWork Condo. Ass'n.*, 210 Cal. App. 4th 132, 152 (2012); *see also Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1073 (2003) ("[W]e do not rewrite any provision of any contract … for any purpose.").

The unambiguous language of Section 12.F does not include the term "any." Instead, Section 12.F requires 12 months' notice if Defendant elected or was required to cease selling or distributing Nissan Vehicles, which includes passenger cars, trucks, cabs, and chassis, utility vehicles, buses, or vans. (ECF No. 72-14, PageID #1651, 1674). There is no dispute that Plaintiff still sells other Nissan Vehicles specified in the Product Addendum and other Supplemental Addenda, such as the LEAF vehicles. (ECF No. 83-2; ECF No. 84, PageID #2212). Thus, 12.F is only triggered if Defendant ceases selling or distributing *all* Nissan Vehicles, and not just "any" Nissan Vehicle. (ECF No. 72-14, PageID #1674). Even more, Section 7.G of the Standard Provisions of the Dealer Agreement grants Defendant the right to discontinue the supply of any

Nissan Product at any time. (*Id.* at PageID #1667). It cannot be said that Defendant violated the Dealer Agreement when acting under its explicit contractual right. Plaintiff's argument is contrary to the plain and unambiguous terms of the Dealer Agreement and, therefore, fails.

Plaintiff's claim for breach of implied covenant of good faith likewise fails. Where a claim for breach of the implied covenant of good faith is based on the same facts as the breach of contract claim, it may be disregarded as duplicative. *Bionghi v. Metro. Water Dist. of S. California*, 70 Cal. App. 4th 1358, 1370 (1999); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (Ct. App. 1990) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."). Plaintiff pleads its breach of contract and breach of implied covenant of fair dealing under the same count and facts within. (ECF No. 1-2, PageID #20–22). Plaintiff's claims for breach of contract and the implied covenant of fair dealing seek compensatory damages "of at least $2,000,000.00." (*Id.* at PageID #22). Thus, the cause of action for breach of the implied covenant is duplicative of the cause of action for breach of contract. Accordingly, Defendant's motion for summary judgment on count three of the Complaint for breach of contract and implied covenants is **GRANTED**.

### D. Count 4 – Breach of Fiduciary Duty

Plaintiff alleges breach of fiduciary duty in count four of the Complaint. (ECF No. 1-2, PageID #22–23). Plaintiff alleges that Defendant's Dealer Agreement places Defendant in a position of disproportionate power over Plaintiff, creates a confidential relationship between the parties, and forces Plaintiff to repose special trust and confidence in Defendant. (*Id.* at PageID #22). Plaintiff asserts that Defendant breached the duty owed to Plaintiff in light of that fiduciary

relationship by 1) failing to provide proper notice of the termination, cancellation, discontinuation, or non-renewal of Plaintiff's "Nissan Commercial Vehicle Dealers franchise agreement," 2) refusing to provide Plaintiff with NV Cargo, NV Passenger, and NV200 vans as required by the OMVDA, and 3) refusing to pay Plaintiff the fair market value of the NV Line franchise.  (*Id*.).

Defendant contends that it does not owe Plaintiff a fiduciary duty under Ohio or California law.  (ECF No. 72-1, PageID #1568).  Defendant notes that Plaintiff cannot point to any language in the Dealer Agreement or any conduct by Defendant that might give rise to a fiduciary relationship between the parties.  (*Id*).  Plaintiff responds that it has sufficiently established the special trust between itself and Defendant because 1) the Dealer Agreement and franchise relationship places Defendant in a position of disproportionate power and dominance over Plaintiff, 2) Plaintiff is required to provide confidential and proprietary business information to Defendant, creating a confidential relationship, and 3) Plaintiff is dependent upon Defendant for economic survival, forcing Plaintiff to repose special trust and confidence in Defendant.  (ECF No. 84, PageID #2230).  Plaintiff asserts that genuine issues of material fact exist regarding the fiduciary relationship.  (*Id*. at PageID #2231).

While the parties did not dispute that California law applied to Plaintiff's claim for breach of contract, the parties seemingly disagree on whether California or Ohio law apply to Plaintiff's claim for breach of fiduciary duty.  Plaintiff relies on both Ohio and California case law in its opposition to Defendant's motion for summary judgment, and solely on Ohio case law in its reply in support of its motion for summary judgment.  (ECF No. 1-2, PageID #22–23; ECF No. 84, PageID #2227).  Defendant relies on California and Ohio case law.  (ECF No. 72-1, PageID #1568).

As a federal court exercising diversity jurisdiction, this Court applies the substantive law of the forum state and federal procedural law to this dispute.  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R. Co. v. Thompkins*, 304 U.S. 64 (1983)).  In this case, the forum state is Ohio, so Ohio choice-of-law rules govern.  "Under Ohio law, contractual choice-of-law provisions are valid and enforceable."  *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 931–32 (S.D. Ohio 2012).   The Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws, which provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Put simply, the parties contractual choice-of-law provision will be enforced unless (a) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (b) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" and which would, in the absence of a choice-of-law provision, be the state with the most significant relationship under Restatement (Second) Section 188.   Restatement (Second) Conflicts of Laws § 187.

The Restatement factors favor application of California law.  As to subsection (a), the parties have a substantial relationship to California.  Defendant is incorporated in California.  As to subsection (b), applying California law would not be adverse to Ohio policy.  Nor does Plaintiff or Defendant make such a showing.  *See Wendy's Int'l, Inc. v. Illinois Union Ins. Co.*, No. 2:05-CV-803, 2007 WL 710242, at *5 (S.D. Ohio Mar. 6, 2007) ("The party seeking to apply the foreign law bears the burden of showing that the foreign law is different from the local law[.]").

"In order for the chosen state's law to violate the fundamental policy of Ohio, it must be shown that there are significant differences in the application of the law of the two states." *Tele-Save Merch. Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1123 (6th Cir. 1987).  Neither Plaintiff nor Defendant argues why either Ohio or California law should apply, nor have they made any showing that there are adequate material differences between the laws of the two states.

Plaintiff does argue that Ohio law recognizes a fiduciary relationship between franchisees and franchisors under a limited exception outlined in *Manhattan Motorcars, Inc. v. Auto. Lamborghini, S.p.A.*, 244 F.R.D. 204 (S.D.N.Y. 2007), but points to no authority where a court in Ohio has held similarly on summary judgment.  Plaintiff merely cites cases which courts assessed whether a fiduciary relationship existed within a franchise relationship at the pleadings stage.  *See Manhattan Motorcars*, 244 F.R.D. at 215 (denying motion to dismiss and holding that "a distributorship agreement may, in some rare instances, create a confidential relationship."); *Franklin Park Lincoln-Mercury, Inc.*, 530 F. App'x 542, 549 (6th Cir. 2013) (affirming denial of summary judgment on fiduciary duty claim because it was not a "rare instance" where a confidential relationship gave rise to a fiduciary duty); *Shepard & Assocs. v. Lokring Tech., LLC,* No. 1:20-CV-02488, 2023 WL 5336986, at *15–16 (N.D. Ohio Aug. 18, 2023) (holding breach of fiduciary duty claim failed as a matter of law because plaintiffs failed to show power imbalance);

*Spitzer Autoworld Akron, LLC v. FCA US LLC*, No. 1:22-CV-01755, 2023 WL 6809935, at *13 (N.D. Ohio Oct. 13, 2023) ("Beyond *Manhattan Motorcars*, no Ohio state court has held that a franchisor has a fiduciary duty to a franchisee … In fact, courts have generally abstained from finding that a fiduciary duty exists in the manufacturer-dealer and franchisor-franchisee relationship context."). Thus, applying California law would not be adverse to Ohio policy, and the choice-of-law provision is valid. Having determined that the choice-of-law provision is valid, the Court must now determine the scope of the provision.

The Sixth Circuit has applied contractual choice-of-law provisions to related tort claims. To determine the scope of a choice-of-law provision, courts begin with its express language. *See Banek Inc. v. Yogurt Ventures U.S.A. Inc.*, 6 F.3d 357, 363 (6th Cir. 1993). A contractual choice-of-law provision applies to tort claims which are closely related to the contractual relationship, as opposed to those that are only tangentially related. *See Adelman's Truck Parts Corp. v. Jones Transp.*, 797 App'x 997, 100 (6th Cir. 2020) (collecting cases). This principle has similarly been applied in the fiduciary duty context. *See Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 851 (N.D. Ohio 2010) (holding that the choice-of-law provision governed not only the plaintiff's breach of contract claim but also plaintiff's fiduciary duty and other tort claims, as those torts were "all closely, and not simply tangentially, related to the performance" of the contract).

In this instant case, Plaintiff's arguments arise from its obligations under the contractual language of the Dealer Agreement. Plaintiff argues that the terms of the Dealer Agreement 1) places Defendant in a position of disproportionate power and dominance over Plaintiff, 2) requires Plaintiff to provide confidential and proprietary business information to Defendant, and 3) Plaintiff is dependent upon Defendant for economic survival, forcing Plaintiff to repose special trust and confidence in Defendant. (ECF No. 1-2, PageID #22; ECF No. 84, PageID #2230). Plaintiff relies

on the language of the Dealer Agreement to argue that the parties had "special trust" with one another. (*Id.*; ECF No. 84, PageID #2230). Plaintiff's claim arises solely from the contractual relationship with Defendant and is not merely tangentially related to it. Further, the choice-of-law provision specifies that "all questions concerning the validity, interpretation or performance of any of its obligations or terms, or of any rights or obligations of the parties hereof" be governed by and resolved in accordance with California law. (ECF No. 72-14, PageID #1682). This is precisely the language the Sixth Circuit found sufficiently broad as to include related torts. *See Banek Inc.*, 6 F.3d at 363 (holding that the choice-of-law provision applied to tort claims because it governed "all rights and obligations hereto" in the agreement). Thus, the choice-of-law provision applies to Plaintiff's fiduciary duty claim, and California law applies.

To state a claim for breach of fiduciary duty, Plaintiff must allege (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820-21 (2011). "California does not recognize the franchisor-franchisee relationship as one that gives rise to fiduciary duties." *BP W. Coast Products, LLC v. Crossroad Petroleum, Inc.*, No. 12-CV-665, 2013 WL 12377979, at *10 (S.D. Cal. Dec. 3, 2013); *see also Passport Health, Inc. v. Travel Med., Inc*., No. 2:09-CV-01753, 2009 WL 3824743, at *4 (E.D. Cal. Nov. 16, 2009) (stating that a fiduciary relationship is not created by a franchisor-franchisee relationship under California law); *Strawflower Elecs., Inc. v. Radioshack Corp.*, No. C-05-0747, 2005 WL 2290314, at *4 (N.D. Cal. Sept. 20, 2005). By nature, commercial transactions in which each party must act to protect its own interest cannot be fiduciary. *Boat v. Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1292 (9th Cir. 1987) ("Where a manufacturer is free to make pricing and distribution decisions for its own benefit, it is far from

being a traditional trustee."). Thus, Plaintiff and Defendant's franchisor-franchisee relationship alone does not create a fiduciary relationship in and of itself.

To the extent that Plaintiff argues an extra-contractual fiduciary relationship based on special trust and confidence, this argument likewise fails. It is well settled in the Ninth Circuit that a fiduciary relationship exists only if a statute expressly creates one, or if both parties mutually understand that the franchisee has placed special trust and confidence in the franchisor. *See id.*; *Walker v. KFC Corp.*, 728 F.2d 1215, 1220, n.5 (9th Cir. 1984) ("There is no indication in the Franchise Investment Law that the Legislature intended, however, to impose a fiduciary duty on franchisors."); *N. Beach, Inc. v. Country Visions, Inc.*, No. 215-CV-02104, 2016 WL 1682046, at *5 (E.D. Cal. Apr. 27, 2016) ("Absent a fiduciary duty imposed by law, a fiduciary relationship may exist when a party knowingly undertakes to act on behalf and for the benefit of another.") (quotation and citation omitted).

Special trust and confidence is not created simply by the receipt of confidential information and must be mutual between the parties. *Strawflower Elecs., Inc.*, 2005 WL 2290314, at *4 (citing *Richelle L. v. Roman Cath. Archbishop*, 106 Cal. App. 4 257, 272 n.6 (Mar. 17, 2003); *see also Power Quality & Elec. Sys., Inc. v. BP W. Coast Products LLC*, 16-CV-04791, 2016 WL 6524408, *9 (N.D. Cal. 2016) (fiduciary relationship did not exist as a result of the parties' confidential relationship and contractual agreement with each other).

Plaintiff and Defendant's relationship was not fiduciary. Plaintiff alleges special trust exists between Plaintiff and Defendant because Defendant "maintained immense control over [Plaintiff] in its business operations." (ECF No. 84, PageID #2229). Plaintiff lists seventeen examples, such as (1) "dealership location," (2) facility specifications, (3) "responsibility for service and parts sales," (4) the "responsibility to maintain an accounting system," (5) the

"responsibility to provide monthly complete and accurate financial and operating statements," (6) the responsibility to "distribute and allocate Nissan new motor vehicles according to [Defendant's] internal policies and procedures," (7) the responsibility to "determine the pricing for new Nissan vehicles and products and unilaterally change the price with ten days prior notice," and (8) the "responsibility to have minimum working capital and financing availability to purchase vehicles and operate the business." (ECF No. 84, PageID #2229–30). Plaintiff further relies on the seventeen requirements for Business Certified Dealers. (*Id.*). In addition, Plaintiff generically alleges it was required to provide Defendant with confidential and propriety business information. (*Id.* at PageID #2230).

Defendants alleged "control" over Plaintiff is common in a franchisor-franchisee relationship. Franchisee responsibility, including service and parts sales, maintenance of an accounting system, and maintaining minimum working capital and financing to purchase vehicles and operate the business are standard requirements that a dealership maintains and are not out of the ordinary.

The same applies to the information Plaintiff shares with Defendant and to other requirements Plaintiff proffers. This includes allowing Defendant to unilaterally change prices with specified notice, given that the manufacturer-franchisor is inherently aware of marketing changes. Even more, the Court acknowledges Sections 7.G of the Standard Provisions, which permits Defendant, in its sole discretion, to discontinue the supply of any Nissan product at any time. (ECF No. 72-14, PageID #1667). Again, this language is standard in the franchisor-franchisee relationship.[11] *See Mid-State Truck Serv., Inc.*, 1988 WL 148432, at *3 (explaining that

---

[11] It is likely the same would be true under Ohio law. To establish the "exceptional circumstances" where a fiduciary relationship arises from special trust and confidence, the agreement among the parties must effectively grant one party "the authority to exercise near life and death economic power" over the other. *Shepard & Assocs.*, 2023 WL

dealer agreement allows franchisor to "discontinue any product at any time" which is "merely a change in competitive circumstances") (citation omitted); *Moffatt Enters., Inc. v. Borden Inc.*, 807 F.2d 1169, 1171 (3d Cir. 1986) (explaining distributor agreement provision reserves the manufacturer "the right from time to time, in its absolute discretion, without thereby incurring any liability to the Distributor … to discontinue or to limit its production of any product, to terminate or limit deliveries of any product the production of which is so discontinued or limited …").

Plaintiff's loss due to the discontinuance of the NV vehicles is not lost on this Court.  As Plaintiff alleges, the OMVDA regulates relationships between manufacturers and dealers to ensure a fair and balanced allocation of power.  *See* O.R.C. § 4517.011; *Nissan Motor Corp., U.S.A. v. Dever*, No. 99AP-596, 2000 WL 311915, at *6 (Ohio Ct. App. Mar. 28, 2000) ("A careful reading of R.C. 4517.56 shows that one of the purposes of the statute is to provide protection to franchisees … from arbitrary decisions of franchisors."); *see also Kings Dodge, Inc.*, 595 F. App'x at 538 (collecting cases acknowledging the remedial purpose of state motor vehicle dealer laws); *Earl Evans Chevrolet, Inc.*, 598 N.E.2d at 1193 (describing O.R.C. § 4517.52 as "remedial and … to be liberally construed to promote" remedies and means for dealers mistreated by franchisors).  But it is also the opinion of this Court that, as the court in *Central* noted, franchise protection does not guarantee a franchisee a risk-free endeavor.  *Central*, 946 F.2d at 334.  "[T]he general purpose of protecting dealers against abuses of superior bargaining power [i]s not intended to insulate them from every adverse turn in a market economy."  *Id.* at 332.  Defendant acted on its contractual right to alter products sold in its sole discretion under Section 7.G.  This practice is common in franchisor-franchisee relationships involving motor vehicles.  (ECF No. 72-9, PageID #1608).

---

5336986, at *16 (quoting *Manhattan Motorcars*, 244 F.R.D. at 219).  Defendant does not exercise "near life and death economic power" over Plaintiff through obligations standard to a franchise agreement.

Defendant did not invoke Section 12.F of the Standard Provisions and discontinue the franchise established by the Dealer Agreement and all addenda.  It is not the opinion of this Court that Defendant took advantage of its bargaining power over Plaintiff in acting within the confines of the Dealer Agreement.  Accordingly, Defendant's motion for summary judgment on count four of the Complaint for breach of contract is **GRANTED**.

V.    **CONCLUSION**

Plaintiff's motion for summary judgment on counts one and two of the Complaint are hereby **DENIED**.  Defendant's motion for summary judgment on counts one through four of the Complaint is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated: December 30, 2025

**CHARLES E. FLEMING**
**UNITED STATES DISTRICT JUDGE**

39